**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Edward A. THOMAS,**
**Defendant-Appellant.**

No. 88-3288.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 8, 1989.

Decided Oct. 13, 1989.

---

John P. Atkins, Bozeman, Mont., for defendant-appellant.

Kris A. McLean, Asst. U.S. Atty., Helena, Mont., for plaintiff-appellee.

Before ALDISERT [*], WRIGHT and BEEZER, Circuit Judges.

ALDISERT, Circuit Judge:

The issue in this case is whether Edward A. Thomas, a Montana hunting guide and outfitter, may be found guilty by jury of two counts of conspiracy to violate the Lacey Act, 16 U.S.C. §§ 3371 et seq. The alleged object of the conspiracy was "to transport, receive and acquire elk in interstate commerce ... in violation of Montana

[*] Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

state hunter's law." Although this court has previously established that a prosecution under the Act may not properly be had for the substantive acts of selling guiding services and hunting permits, *United States v. Stenberg*, 803 F.2d 422 (9th Cir. 1986), the issue of whether prosecution may be maintained for conspiracy to violate the Act through such acts has not yet been decided by this court.

The Lacey Act prohibits transportation or acquisition in interstate commerce of wildlife in violation of state, tribal and federal wildlife laws. A United States District Court found Thomas guilty of conspiracy to violate the Act, imposed a fine upon him, sentenced him to three years probation, and required him to forfeit all hunting, fishing, trapping and guiding privileges during the probation period.

Thomas contends that the Lacey Act does not apply to guiding/outfitting services, that the government failed to present sufficient evidence to support a connection conspiracy under either count, that it failed to prove the jurisdictional qualification of interstate transportation, and that the court applied an improper statute of limitations.

Jurisdiction was proper in the trial court based on 18 U.S.C. § 3231. Jurisdiction on appeal is proper based on 28 U.S.C. § 1291, and the appeal was timely filed under Rule 4(b) Fed.R.App.P.

The standards of review are familiar. Whether the informations alleged a violation of law, whether the lower court properly interpreted the Lacey Act, and whether the district court's instructions to the jury misstated elements of a statutory crime are questions of law which are reviewed *de novo*. *Julian v. United States Dept. of Justice*, 806 F.2d 1411, 1416 (9th Cir.1986), *aff'd*, 486 U.S. 1, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Lane,*

765 F.2d 1376, 1381 (9th Cir.1985) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

## I.

Late in 1986, Gene Meister, a Wisconsin resident, contacted Thomas to arrange two Montana elk hunts, one for Dale Hibbard and Mark Braden and the other for Meister's nephew, Jim Cotterman. Montana requires both a non-resident special elk hunting license and a late season permit, which neither Braden nor Hibbard had.

Thomas testified he is licensed as an outfitter by the State of Montana and has known Gene Meister for approximately three years. Hunters from Lake Geneva, Wisconsin, would often communicate with him through Meister. He acknowledged that to become a Montana licensed outfitter one must take and pass an extensive test, including a section on the state's hunting laws and that he was aware that a person may hunt in Montana only with a valid license issued in his or her name. Brief for appellee at 13. He testified he had obtained approximately $7,000 worth of business from Gene Meister over the years and that repeat business is important to an outfitter. *Id.* at 12. We will address the two hunts separately.

## A.

Because Braden and Hibbard did not have the necessary Montana hunting licenses and late season permits, Meister arranged for them to use licenses and permits belonging to two other men, John Register and Larry Otto. Meister mailed these licenses and permits to Thomas in advance so that Thomas and his guides could arrange to have the licenses and permits validated by the Montana Fish and Game Department and obtain a preferred hunting area. On the evening of January 16, 1987, Hibbard and Braden arrived at the Thomas residence, paid their guide fee to Mrs. Thomas, and accepted the hunting permits made out in the names of John Register and Larry Otto. It is unclear how the two men introduced themselves. Mr.

and Mrs. Thomas each testified that they did not look at the names on the permits, and did not know the two men were hunting on other hunters' licenses while Hibbard and Braden testified that they "assumed" Thomas knew this. Thomas understood that Braden was going to take any elk he shot back to Wisconsin with him.

Sometime prior to January 18, 1987, Montana Game Warden James Heck learned that a person posing as Larry Otto would be hunting in Montana during the late elk hunting season. He informed his personnel to notify him if they encountered anyone known as Larry Otto. On January 18, a Larry Otto appeared at the Gallatin Check Station. An employee notified the warden that a person claiming to be Otto was there along with a John Register. The warden then communicated with the real John Register who was in Wisconsin. Braden and Hibbard then admitted that they were hunting with improper documentation. The warden issued tickets fining Hibbard and Braden a total of $600 for closed season elk hunting.

### B.

Meister also forwarded to Thomas the license and permit belonging to William Wheeler of Illinois for the use of Meister's nephew, Jim Cotterman. When Cotterman arrived at the house, a permit in the name of Wheeler was waiting for him. Cotterman introduced himself to Thomas using his real name. Thomas then handed Cotterman a Montana special elk hunting permit issued to William Wheeler and told him, "That's who you are." When Cotterman asked the defendant what to do if he got caught, the defendant replied, "Don't worry about it," he would take care of it. On the first morning of his hunt, Cotterman killed a cow elk and Thomas placed Wheeler's hunting license on it. Jim Cotterman then gave the dead elk to a hunting companion, Gordon Iverson, who happened to be the father of the William Wheeler whose hunting license Cotterman was using.

At the time of the alleged conspiracy, William Wheeler lived in Harvard, Illinois, and owned and operated a trailer truck.

He obtained licenses to hunt both regular and late seasons in Montana as a graduation present from his parents. Meister had filled out the required application to obtain the Montana non-resident licenses for him and accompanied him on a fall 1987 hunt in Montana, but Wheeler did not hunt elk in Montana during the late season of 1987. Even so, a full grown cow elk with William Wheeler's license attached appeared alongside William Wheeler's driveway in Illinois several days after Wheeler's father, Gordon Iverson, came home from hunting elk in Montana with Cotterman.

### II.

By information Thomas was charged with two counts of conspiring to violate the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(2), which prohibits transportation or acquisition in interstate commerce of wildlife possessed, transported or sold in violation of any state law. It is central to this appeal that Thomas was charged with conspiracy only and not charged with committing the substantive offenses. The Montana laws underlying this action provide in relevant part:

> License required. It is unlawful for any person to: ... (3) ... pursue, hunt, trap, take, shoot, or kill ... any game animal ... without first having obtained a proper license or permit ...

Mont.Code Ann. § 87-2-103.

> Alteration of transfer of license. No person may at any time alter or change in any material manner or loan or transfer to another any license, nor may any person other than the person to whom it is issued use it.

Mont.Code Ann. § 87-2-110.

The federal Lacey Act provides in relevant part:

> It is unlawful for any person—
> (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—(A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation

of any State or in violation of any foreign law ...

16 U.S.C. § 3372(a)(2)(A).

Any person who—

．　　．　　．　　．　　．

(B) violates any provision of this chapter ... by knowingly engaging in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife or plants with a market value in excess of $350, knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in any manner unlawful under, any underlying law, treaty or regulation, shall be fined not more than $20,000, or imprisoned for not more than five years, or both....

16 U.S.C. § 3373(d)(1)(B).

Any person who knowingly engages in conduct prohibited by any provision of this Act ... and in the exercise of due care should know that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation shall be fined not more than $10,000, or imprisoned for not more than one year, or both.

16 U.S.C. § 3373(d)(2).

### III.

Thomas first argues that the Lacey Act's prohibition against transporting, receiving, or acquiring wildlife taken in violation of state law does not extend to providing guiding services. In support of this argument, he relies on *United States v. Stenberg*, 803 F.2d 422 (9th Cir.1986), wherein we held that "the Lacey Act's prohibition of the 'sale of wildlife' does not apply to the sale of guiding services or hunting permits. The statute simply does not cover such conduct." *Id.* at 437.

Appellant fails to understand the critical distinction between the charges in *Stenberg* and the charges here. The *Stenberg* defendant was charged with "selling in interstate commerce wildlife." The issue in that case was "whether the sale either of a

hunting license or of guiding services constitutes a 'sale of wildlife' for purposes of the Lacey Act." *Id.* at 435. Neither the sale of a hunting license nor the provision of guiding services are at issue in this case. Thomas was neither charged with the sale of wildlife nor with any other substantive offense under the Lacey Act. Instead, he was charged with two *conspiracies* to violate the Act, the alleged object of which was "to transport, receive and acquire elk in interstate commerce ... in violation of Montana state hunting laws."

 Conspiracy to commit a substantive offense and the substantive offense itself are separate and distinct offenses. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Becker*, 720 F.2d 1033, 1036 (9th Cir.1983). Appellant need not have committed the underlying substantive violation of the Montana Code to be charged with and found guilty of conspiracy. Each conspirator is liable for the criminal acts of all coconspirators as long as "(1) the substantive offense was committed in furtherance of the conspiracy; (2) the offense fell within the scope of the unlawful project; and (3) the offense could reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement." *United States v. Douglass*, 780 F.2d 1472, 1475–76 (9th Cir.1986) (relying on *Pinkerton*, 328 U.S. at 647–48, 66 S.Ct. at 1184). Thomas was not accused of breaking the law by providing guiding services, but with *conspiring to* transport or acquire elk taken in violation of Montana law. The underlying violation in each case was the act of hunting with a transferred license or permit, acts allegedly committed by others. *Stenberg* does not control here.

### IV.

Prior to trial, Thomas moved to dismiss the informations, contending that they charged him with having two separate and distinct states of mind for the offenses charged. The informations alleged that the conspirators "did knowingly conspire and plan together to transport, receive, and acquire elk in interstate or foreign com-

merce, when in the exercise of due care [they] should have known said elk were taken and possessed in violation of Montana state hunting laws." Appellant argues that he could not knowingly conspire or agree to perform negligent conduct, viz., fail to exercise due care.

For the same reason, appellant also objects to the wording of the jury instructions. The district court instructed the jury in part:

To establish the crime charged, the government must prove four elements beyond a reasonable doubt:

First, that there was an agreement to transport, receive and acquire elk in interstate or foreign commerce when in the exercise of due care those agreeing should have known said elk were taken and possessed in violation of Montana state hunting laws....

Brief for Appellant at 33.

■ Thomas objected to the due care language in the instructions and requested that it be stricken, and that the word "knowing" be substituted for the words "should have known." The court overruled his objection. This was not error.

### A.

The "due care" language in the instructions derives from section 3373(d)(2) of the Lacey Act. Subsection (d) provides for the imposition of criminal penalties. Under subsection (d)(1), any person who knowingly engages in conduct prohibited by the Act "knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law" commits a felony. Under subsection (d)(2), however, any person who knowingly engages in conduct prohibited by the Act, and who "in the exercise of due care should know that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law" commits a misdemeanor. Thus, it is important to understand first that there is a difference between the felony set forth in subsection (d)(1) and the misdemeanor in subsection (d)(2), and second,

that Thomas was charged with a conspiracy to violate subsection (d)(2) and not (d)(1).

Congress explained the mens rea requirement for the violation of subsection (d)(2) in the legislative history accompanying the passage of the Act:

... Like most criminal laws, Section 4(d)(2) is a general intent statute. Prosecutions under such laws do not require the Government to prove that the defendant knew his activity was unlawful. Proof of a volitional act is sufficient.... Therefore, in addition to proof of a volitional act, Section 4(d)(2) requires proof that the defendant in the exercise of due care should have known that the fish, wildlife or plants were taken, possessed, transported, or sold in violation of any underlying law....

S.Rep. No. 123, 97th Cong., 1st Sess. 12 (1981), *reprinted in* 1981 U.S.Code Cong. & Admin.News 1748, 1759 (hereinafter "Senate Report").

### B.

The Supreme Court has held that "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola,* 420 U.S. 671, 686, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975) (citing *Ingram v. United States,* 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959)). In *Feola* the statute at issue was 18 U.S.C. § 111, proscribing the assault of a federal officer engaged in the performance of his official duties and of conspiracy to commit that offense, in violation of the general conspiracy statute, 18 U.S.C. § 371. The Court held that inasmuch as the underlying statute did not require knowledge that the victim was a federal officer, those agreeing to commit the assault could be found guilty of conspiring to violate the statute without that specific knowledge. The Court refused to answer "the question whether it is fair to punish parties to an agreement to engage intentionally in apparently innocent con-

duct where the unintended result of engaging in that conduct is the violation of a criminal statute." *Id.* 420 U.S. at 691, 95 S.Ct. at 1267.

However, this court has decided at least one case in which we did just that. In *United States v. Karr,* 742 F.2d 493 (9th Cir.1984), we examined a conviction for conspiracy to receive stolen explosives. The underlying statute made it "unlawful for any person to receive ... explosive materials knowing or having reasonable cause to believe that such explosive materials were stolen." 18 U.S.C. § 842(h). The appellant in *Karr* argued that the government had to "show that he *knew* the dynamite was stolen." *Karr,* 742 F.2d at 497 (emphasis in original). We disagreed. We held that the government "had only to show he had 'reasonable cause to believe' that it was stolen." *Id.* The decision in *Karr* comports with the rule of *Feola* in that it requires the same degree of intent for the conspiracy charge as is required by the underlying statute. We think that the standard of "reasonable cause to believe" in *Karr* is similar to the "should have known" standard at issue in the present case. *See also United States v. Chagra,* 807 F.2d 398 (5th Cir.1986), *cert. denied,* 484 U.S. 832, 108 S.Ct. 106, 98 L.Ed.2d 66 (1987).

### C.

In the present case, the district court did explain that to be found guilty of conspiracy, "in the exercise of due care those agreeing should have known said elk were taken and possessed in violation of Montana state hunting laws." Brief for appellant at 33. Thomas acknowledged at trial that to become a licensed outfitter in Montana, one must pass a test that includes a section on Montana hunting laws, and that he is aware that a person can only hunt in Montana with a valid license issued in his or her name. Brief for appellee at 13. Appellant was not charged with conspiring to be negligent, rather he was charged with negligently conspiring—making an agreement to do an act that he should have known was illegal. *Karr* and *Chagra* sup-

port the validity of this type of conspiracy charge. Appellant offers no authorities that hold otherwise.

### V.

Appellant next argues that no testimony established a conspiracy between Thomas and Meister and none established "even a prima facie case of interstate transportation ... or even an intent to transport elk interstate." Brief for appellant at 23. Appellant seems to believe that the government was required to establish its case by direct evidence. The proper test to be applied here is whether, looking at the evidence in the light most favorable to the government, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Dupuy,* 760 F.2d 1492, 1500 (9th Cir.1985) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original). Circumstantial evidence and permissible factual inferences drawn from it may be sufficient to sustain a conviction. *United States v. Lewis,* 787 F.2d 1318, 1323 (9th Cir.1986), *cert. denied,* — U.S. ——, 109 S.Ct. 1169, 103 L.Ed.2d 227 (1989) (citations omitted).

The essential elements of a conspiracy are "an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *United States v. Reése,* 775 F.2d 1066, 1071 (9th Cir.1985). The government need not show either a direct contact or explicit agreement among the alleged conspirators. *Id.* "A formal agreement is not necessary; rather the agreement may be inferred from the defendants' acts pursuant to the scheme, or other circumstantial evidence." *United States v. Bibbero,* 749 F.2d 581, 587 (9th Cir.1984), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985). Moreover, although mere proximity to the scene of illicit activity is not sufficient to establish involvement in a conspiracy, a defendant's presence may support such an inference when

viewed in context with other evidence. *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir.1987) (citing *United States v. Reese*, 775 F.2d 1066, 1071–72 (9th Cir. 1985)).

The evidence showed that Meister, a Wisconsin resident, referred three hunters to Thomas, a Montana resident. It showed that Meister transferred to Thomas across state lines hunting licenses and permits to be used by three hunters, Hibbard, Braden, and Cotterman, which bore the names of three other men, Register, Otto, and Wheeler.

To be sure, there was inconsistent testimony as to whether Meister or anyone else told Thomas the real names of the actual hunters. But it was for the jury to decide where the truth lay. Hibbard and Cotterman contended they introduced themselves by their real names. Thomas said that he had a hearing problem and testified further that he did not look at the names on the permits or concern himself with the hunters' names. Cotterman told a different story, saying that Thomas handed him a permit issued in the name of William Wheeler and told him, "That's who you are." Cotterman also testified that Thomas told him not to worry about getting caught, that Thomas would take care of it. Thomas denied that these exchanges took place.

However there was uncontroverted evidence of physical acts. Testimony revealed that Cotterman killed a cow elk, that Thomas placed Wheeler's license on it, that Cotterman gave the carcass to Gordon Iverson (William Wheeler's father), and that a dead cow elk bearing Wheeler's license appeared in Wheeler's driveway in Illinois after Iverson returned from Montana.

This evidence was sufficient to allow the jury to infer the existence of a conspiracy, an illegal objective (interstate transportation of elk killed in violation of Montana law), one or more overt acts (transfer of the licenses), and the necessary intent (that the conspirators knew or should have known hunting with improper licenses was illegal). The evidence was also sufficient to allow the jury to infer that Thomas was a member of this conspiracy. The government did not have to prove Thomas' participation by direct evidence. Nor did it have to prove by direct, as distinguished from circumstantial evidence, intent to transport elk interstate or that an elk was in fact so transported.

## VI.

Finally, we turn to the statute of limitations. The informations were filed on May 13, 1988, and charged a conspiracy commencing "on or about the 1st day of December, 1986, and continuing until on or about January 17, 1987." Citing no authority, appellant argues that because the statute of limitations for the underlying Montana law is one year, the statute of limitations had run on the Lacey Act conspiracy charge. Prior to filing the information, the district court denied Thomas' motion to dismiss on this ground, ruling that the "[d]efendants are charged with federal offenses governed by federal law." *U.S. v. Meister*, No. 88–17 to 21 (D.Mont. Aug. 8, 1988). The court applied the five-year statute of limitations applicable to federal offenses not otherwise expressly provided for by law. *See* 18 U.S.C. § 3282. Although the question of whether the appropriate statute of limitations for Lacey Act cases should be taken from federal law or an underlying state law does not appear to have been decided by any court, the Supreme Court has furnished some guidance.

In *Agency Holding Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), the Court faced the question of whether a uniform federal statute of limitations or borrowed state limitation statutes should be used in civil RICO [Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.] actions. Justice Scalia, concurring in the judgment, wrote that "[t]he issue presented by this case cannot arise with respect to federal criminal statutes, as every federal offense is governed by an express limitations period. If no statute specifically defines a limitations period … for a particular offense, a 'catchall' statute [18 U.S.C. § 3282] operates to forbid prosecu-

tion, trial, or punishment 'unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.'" *Id.* at 157, 107 S.Ct. at 2767–68. We believe that Justice Scalia's comments are applicable here.

Although the underlying violation here involves a state statute, the charges were brought by federal authorities in federal court pursuant to federal statutory law. The action was not brought in a state court pursuant to state statutes. In fact the Act provides penalties for violations that may exceed the penalties available under state law. *See* Senate Report at 15, 1981 U.S. Code Cong. & Admin.News p. 1762. ("Some violations of this Act will involve violations of State hunting laws or regulations that have historically been classified as misdemeanors. Nevertheless ... the violation may be a felony violation of this Act.") Thus, the statute creates a new violation arising out of the same conduct as that violating state law.

A persuasive analogy may be found in various decisions holding that state statutes of limitations do not apply to state crimes that form the basis of charges under RICO. *See, e.g., United States v. Licavoli,* 725 F.2d 1040, 1046–47 (6th Cir.1984), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984) (citing *United States v. Malatesta,* 583 F.2d 748, 758 (5th Cir. 1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979)); *United States v. Davis,* 576 F.2d 1065, 1066–67 (3d Cir. 1978), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Forsythe,* 560 F.2d 1127, 1134 (3d Cir. 1977). These cases have determined that the state law reference in the federal statute simply defines wrongful conduct, and is not designed to incorporate state procedural law. *See also United States v. Brown,* 555 F.2d 407, 418 n. 22 (5th Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). The same rule would be appropriate in this case.

At bottom, this case turns on the fact that Thomas was charged with violating a federal criminal statute. Although the statute does not in itself contain a statute of limitations, Congress has provided for a "catch-all" statute of limitations of five years, 18 U.S.C. § 3282, applicable to those statutes that do not specifically define a limitations period. The Lacey Act is exactly that type of statute.

### VII.

 Special assessments have been declared unconstitutional in this circuit. *United States v. Munoz–Florez,* 863 F.2d 654 (9th Cir.1988). The district court imposed a $50.00 special assessment on defendant Thomas. This portion of defendant's sentence is vacated.

### VIII.

Upon consideration of all the contentions raised by the appellant, we conclude that the judgment of the district court is affirmed in part and vacated in part.