**Noah HARJO, Dennis Dean Wright, and Paula Marie Wright, Appellants,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–88–256.**

Court of Criminal Appeals of Oklahoma.

Aug. 2, 1990.

Rehearing Denied Sept. 6, 1990.

An Appeal from the District Court of Tulsa County; Clifford E. Hopper, District Judge.

Noah Harjo, Dennis Dean Wright, and Paula Marie Wright, appellants, were convicted of First Degree Murder (Count I) and Conspiracy to Commit First Degree Murder (Count II), each After Former Conviction of a Felony, in the District Court of Tulsa County, Case No. CRF–87–860. Each appellant was sentenced to life imprisonment on Count I, appellants Harjo and Dennis Wright were sentenced to twenty (20) years imprisonment on Count

II, and appellant Paula Wright was sentenced to ten (10) years imprisonment on Count II. AFFIRMED.

Johnie O'Neal, Public Defender, Tulsa, for appellants.

Robert H. Henry, Atty. Gen., Sandra D. Howard, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Presiding Judge.

Noah Harjo, Dennis Dean Wright, and Paula Marie Wright, appellants, were tried by jury for the crimes of First Degree Murder (21 O.S.Supp.1982, § 701.7(A)) (Count I) and Conspiracy to Commit First Degree Murder (21 O.S.1981, § 421) (Count II), each After Former Conviction of a Felony, in the District Court of Tulsa County, Case No. CRF–87–860. The jury returned verdicts of guilty on all counts and recommended sentences of life imprisonment on Count I for each appellant, twenty (20) years imprisonment on Count II for appellants Harjo and Dennis Wright, and ten (10) years imprisonment on Count II for appellant Paula Wright.[1] The trial court sentenced appellants accordingly. From these Judgments and Sentences, appellants have perfected this appeal.

During the month of June, 1986, Michael Fish was staying at the Tulsa home of appellants Dennis and Paula Wright, along with Paula's sons, Mark and Marty Langley. On the afternoon of June 26, 1986, however, Mr. Fish appeared at the home of Teresa Landsaw carrying his personal belongings and asked to stay the night. Landsaw consented and subsequently learned that Fish had some cocaine for sale. Thereafter, she purchased four hundred dollars ($400.00) worth of cocaine from Fish.

Later that evening, appellant Paula Wright stopped by to talk to Fish on three separate occasions. After speaking with Paula the first time, Fish appeared to be "a

---

1. Codefendant Marty Lee Langley was tried conjointly with appellants and acquitted on both counts.

little jumpy, a little nervous." Following the second conservation, Fish related to Ms. Landsaw that he was scared. When Paula appeared for the third time, accompanied by an unidentified man, Fish walked to a back hall and initially instructed Landsaw not to answer the door. Nevertheless, Landsaw opened the door, Fish walked outside to speak with the two visitors and never returned.

Approximately two (2) hours later, Landsaw and a friend became suspicious and walked to the Wright's home. Upon their arrival, one of Paula's sons informed the women that Fish had gone somewhere with Paula. Later that night, Paula and one of her sons appeared at Landsaw's home and asked for Fish's personal belongings. Landsaw refused to relinquish the items.

Tonya Elliott, a neighbor of the Wright's, testified that Marty and Mark Langley came to her home several times during the evening of June 26, 1986. She stated that Marty borrowed a baseball bat around 7:00 p.m. and returned it later in the evening. At approximately 8:30 p.m., Elliott observed Fish and Paula Wright enter the Wright home. Thereafter, Elliott and her boyfriend, Mike Williams, along with Mark and Marty Langley, noticed some fighting going on under the Wright's carport and heard a male voice yelling for help. Williams testified that he saw five or six people at the scene and that he later observed the Wright's car leaving the carport.

Angela Davis, the girlfriend of appellant Noah Harjo, testified that she and Harjo were living together in June of 1986. At approximately 6:30 or 7:00 p.m. on June 26, 1986, Dennis Wright, Paula Wright and Marty Langley appeared at her home. When Harjo walked over to greet them, Davis overheard the group discussing something about a gun. Davis was subsequently informed that the group needed a gun to rob someone. Thereafter, Paula told her that she had considered hitting the person in the head with an ax handle to effect a robbery. Davis testified that she did not take appellants seriously at that time and that she was not informed of the

intended victim's name until later in the evening. After discussing their robbery plan, the group, accompanied by Davis, drove to the Wright's home.

Upon their arrival, Dennis and Harjo walked to the back bedroom of the house, Paula left to retrieve Fish, and Marty went next door to get a baseball bat. Marty thereafter returned with the bat but then left the scene. Paula later returned with Fish, introduced him to Davis, and led him to the back bedroom. Davis testified that she then heard some arguing and struggling in the bedroom, and observed Marty enter the house, run to the bedroom, and scream, "My God, don't kill him." At one point during the altercation, Paula retrieved a knife from the kitchen and returned to the bedroom. Approximately twenty (20) minutes later, the three appellants and Fish came out of the bedroom. Fish was covered with blood and being held by Harjo at that time. Davis testified that she was instructed by Harjo to leave the house and that she then witnessed appellants take Fish to the carport. Fish screamed for help as he was placed in the Wright's automobile. Davis then complied with instructions to get in the car, and the group drove out of town and stopped at a bridge. Davis stated that she turned her back as the group exited the car and when she turned around Fish was gone. She also testified that Dennis Wright thereafter gave Harjo five hundred dollars ($500.00) and some cocaine which he had taken from Fish.

Michael Fish's body was discovered the next day floating in Salt Creek in Wagoner County. An autopsy revealed that Fish died from a stab wound to the abdomen. The autopsy also revealed numerous blunt trauma wounds to the forehead, lower lip, left hand, scalp, and left forearm. It was the opinion of the examining pathologist that the blunt trauma occurred before the stab wound and that the forearm and hand injuries were defensive in nature. The appellants were arrested in Florida in October of 1986.

▆▆▆ In their first assignment of error, appellants assert that the trial court erred

in denying defense counsel's motion to withdraw from representing appellant Harjo due to an alleged conflict of interest. Prior to trial, the Public Defender's Office sought to withdraw from representation of appellant Harjo on the basis of an "irreconcilable conflict of interest." (O.R. 25). While no transcript of the ensuing motion hearing appears in the record, the trial transcript reveals that said motion was overruled because "the only thing this Court is being told is that there is a possibility that something might exist and I don't feel that it's sufficient...." (Tr. 7–8).

Relying on *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), appellants contend that defense counsel's allegation of an "irreconcilable conflict of interest" established adequate grounds for withdrawal and that prejudice was thereby presumed. In *Holloway,* a single public defender, who was appointed to represent three defendants at trial, made timely and repeated assertions that the interests of his clients conflicted. Despite such efforts, the trial court refused to consider the appointment of separate counsel. In fact, the trial judge apparently "cut off any opportunity of defense counsel to do more than make conclusory representations." *Id.* 435 U.S. at 484 n. 7, 98 S.Ct. at 1178 n. 7. In oral argument before the Supreme Court, defense counsel stated that the trial court did not request him to disclose the basis for his representations as to a conflict of interest. *Id.*

The *Holloway* Court recognized that "[r]equiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel." *Id.* 435 U.S. at 482, 98 S.Ct. at 1178. The Court did not, however, consider whether the alleged conflict actually existed. It simply held that the trial court's failure to respond to timely objections unconstitutionally endangered the right to counsel. *Id.* 435 U.S. at 483–487, 98 S.Ct. at 1178–1180.

In *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Court revisited *Holloway* and stated:

> Since a possible conflict inheres in almost every instance of multiple representation, a defendant who objects to multiple representation must have the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial. But unless the trial court fails to afford such an opportunity, a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel. Such a presumption would preclude multiple representation even in cases where "[a] common defense ... gives strength against a common attack."

*Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718 (citation omitted).

> [T]he possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance.

*Id.* 446 U.S. at 350, 100 S.Ct. at 1719. *See also Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987).

The present case is clearly distinguishable from the facts set forth in *Holloway.* There, defense counsel was given no opportunity to establish the alleged conflict of interest. In the case at bar, however, it is apparent that defense counsel was given such an opportunity. Therefore, this Court will not presume prejudice. "Prejudice is presumed only where the trial court fails to conduct an inquiry after a timely conflict objection has been made." *Williams v. State,* 736 P.2d 536, 537 (Okl.Cr.1987) (citing *Holloway,* 435 U.S. at 488, 98 S.Ct. at 1181). In the present case, the substance of the motion hearing was not made a part of the appellate record. It is well settled that defense counsel has a duty to ensure that sufficient record is provided to determine issues raised on appeal. *Chambers v. State,* 764 P.2d 536, 537 (Okl.Cr.1988). The only record presented for our consideration, other than defense counsel's bald alle-

gation of conflict, is the ruling of the judge at trial. The judge's statement indicates only that defense counsel declared that a "possibility" of conflict "might exist." Such an assertion is clearly "insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719. Because we find that appellants have failed to establish prejudice as a result of defense counsel's multiple representation, *see Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we deem their first assignment of error meritless.

■ Appellants next contend that their conspiracy convictions must be reversed because the Information was fatally defective. Particularly, they claim that Count II failed to contain a description of a specific overt act. Although appellants raise this issue for the first time on appeal, they maintain that the alleged defect is jurisdictional in nature. It is well settled that a criminal information is insufficient if it does not allege all the essential elements of the offense charged, *Hendricks v. State*, 698 P.2d 477, 480 (Okl.Cr.1985), and that defects in the information which go to the jurisdiction of the court are never waived. *Davis v. State*, 647 P.2d 450, 452 (Okl.Cr. 1982).

■ The essential elements of the crime of conspiracy are: (1) an agreement by two or more persons to commit a crime, and (2) an overt act committed by one or more of the co-conspirators in furtherance of the conspiracy. *Russell v. State*, 654 P.2d 1058, 1066 (Okl.Cr.1982); 21 O.S.1981, §§ 421, 423. An information which charges such offense must allege an overt act. *White v. State*, 582 P.2d 1334, 1335 (Okl.Cr.1978); 22 O.S.1981, § 741. Count II of the Information in the present case provided:

> On or about the 26th day of June, 1986, in Tulsa County, State of Oklahoma, the said defendants did unlawfully, willfully and feloniously, while acting in concert each with the other, did conspire and agree each with the other, to commit the crime of MURDER FIRST DEGREE, a felony, by luring MICHAEL OSHEY FISH to an apartment where the said defendants were waiting for him, and in furtherance of said conspiracy did commit the following overt act, MURDER FIRST DEGREE....

■ Relying upon *Plotner v. State*, 762 P.2d 936 (Okl.Cr.1988), appellants assert that the language alleging that they committed Conspiracy to Commit First Degree Murder by committing the overt act of "MURDER FIRST DEGREE" is a legal tautology; meaningless in reference to any overt act other than the killing itself. We find, however, that a resolution of this particular argument is not necessary in the present case. Rather, we find that the language "by luring MICHAEL OSHEY FISH to an apartment where the defendants were waiting for him" adequately alleged an overt act in furtherance of the appellants' conspiracy. Accordingly, we hold that the overt act alleged in Count II was sufficient to confer jurisdiction upon the trial court to try appellants for the crime of Conspiracy to Commit First Degree Murder. This assignment is therefore without merit.

■ In their next assignment of error, appellants contend that the trial court erred in overruling their motion to dismiss Count II on the basis of double jeopardy. This Court was presented with an identical argument in *Stohler v. State ex rel. Lamm*, 696 P.2d 1038, (Okl.Cr.1985). There, we stated "that a conspiracy to commit an unlawful act constitutes an independent crime, complete in itself and distinct from the unlawful act contemplated." *Id.* at 1040. This proposition of law is supported by prior decisions of this Court, *see Combs v. State*, 94 Okl.Cr. 206, 233 P.2d 314 (1951); *McCreary v. Venable*, 86 Okl.Cr. 169, 190 P.2d 467 (1948); *Burns v. State*, 72 Okl.Cr. 432, 117 P.2d 155 (1941), by decisions of the federal courts of appeals, *see, e.g., United States v. Thomas*, 887 F.2d 1341 (9th Cir.1989); *United States v. Corley*, 824 F.2d 931 (11th Cir.1987); *United States v. Soteras*, 770 F.2d 641 (7th Cir.1985); *United States v. Goldberg*, 756 F.2d 949 (2nd. Cir.1985), *cert. denied* 472 U.S. 1009, 105 S.Ct. 2706, 86 L.Ed.2d 721

(1985); *United States v. Young*, 634 F.2d 1136 (8th Cir.1980); *United States v. Dunbar*, 591 F.2d 1190 (5th Cir.1979), *on reh'g* 611 F.2d 985 (1980), *cert. denied* 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980); *United States v. Shelton*, 573 F.2d 917 (6th Cir.1978), *cert. denied* 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978); *United States v. Davis*, 544 F.2d 1056 (10th Cir. 1976), *appeal after remand* 573 F.2d 1177 (1978), *cert. denied* 436 U.S. 930, 98 S.Ct. 2829, 56 L.Ed.2d 775 (1978), and by numerous state courts, at least two of which have directly considered the issue at bar. *See Smith v. State*, 465 N.E.2d 1105 (Ind.1984); *People v. Scotts*, 80 Mich.App. 1, 263 N.W.2d 272 (1977) (both courts held that double jeopardy is not offended by prosecution of both conspiracy to commit murder and the substantive crime of murder).

In *Stohler*, this Court applied the "same evidence" test enunciated in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and held that the prosecution of both Conspiracy to Commit Murder and First Degree Murder was not barred by double jeopardy. Such conclusion was reached because each crime has at least one element that the other lacks. "Conspiracy to Commit Murder requires two or more persons planning together; First Degree Murder requires the death of a person." *Stohler*, 696 P.2d at 1040. This Court finds that the principles announced in *Stohler* are equally applicable today. Therefore, we are not persuaded by appellants' plea to overrule the same. On the basis of the foregoing, we find that the trial court properly overruled defense counsel's motion to dismiss Count II.[2]

Appellants next assign as error the trial court's admission of certain testimony of Angela Davis. As the State's final witness, Davis was asked to recall several statements made by appellants during the night of the murder. Defense counsel ob-

jected to the introduction of this testimony, and appellants now contest the same, on the grounds that the trial court failed to follow the mandates of *Laske v. State*, 694 P.2d 536 (Okl.Cr.1985), prior to admitting these co-conspirator statements.

In *Laske*, this Court discussed the admissibility of co-conspirator's statements pursuant to 12 O.S.1981, § 2801(4)(b)(5), which provides: "A statement is not hearsay if the statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." The Court then considered the following four-step procedure for determining admissibility of hearsay evidence:

1. The judge alone, pursuant to Rule 104(a), Fed Rules of Evidence, [12 O.S. 1981, § 2105(A)] makes the determination as to the admissibility of hearsay co-conspirator statements.

2. The court makes a threshold determination based upon substantial independent evidence.

3. It is preferable whenever possible to require the government to first introduce independent proof of the conspiracy and subsequent thereto, to establish the connection of the defendant with the conspiracy before admitting hearsay declarations of co-conspirators.

4. At the conclusion of all the evidence, the district court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed; (2) that the co-conspirator and the defendant against whom the co-conspirator's statement is offered were members of the conspiracy; and (3) that the statement was made during the course and in furtherance of the conspiracy.

---

2. This writer advocated the use of the "same transaction" test, the standard urged by appellants herein, in a separate opinion in *Stohler. See Stohler*, 696 P.2d at 1041 (Parks, P.J., dissenting). "I am of the opinion that the 'same transaction' test for double jeopardy, as skillfully explained by Justice Brennen in *Ashe v. Swenson*, 397 U.S. 436, 448, 90 S.Ct. 1189, 1197,

25 L.Ed.2d 469 (1970), is eminently correct, and affords the proper interpretation of both the Fifth Amendment to the U.S. Constitution and article 2, section 21 of the Oklahoma Constitution." *Stohler*, 696 P.2d at 1041. However, on the basis of *stare decisis*, I yield my view to that of the majority of this Court.

*Laske,* 694 P.2d at 538 (citing *United States v. Stipe,* 653 F.2d 446, 449 (10th Cir.1981)).

In conclusion, the *Laske* Court stated: We are of the opinion that the procedure outlined in *United States v. Stipe, supra,* not only.requires the judge to make a preliminary determination, but also that it be based on competent evidence. Further, the government must present its case in the "preferred order of proof;" independent evidence first, then hearsay. Allowing the hearsay in, to later be "connected up" as was done in the present case, was strongly criticized in *United States v. Stipe....*

*Laske,* 694 P.2d at 539.

Subsequent to the promulgation of the aforestated test, the United States Supreme Court reevaluated the standard for admitting co-conspirator statements in *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). There, the Court reiterated that a trial court may admit statements of co-conspirators under Fed.R.Evid. 801(d)(2) after finding, by a preponderance of the evidence, that: (1) a conspiracy existed, (2) the declarant and the defendant against whom the declarations are offered were members of the conspiracy, and (3) the statements were made in the course and in furtherance of the conspiracy. *Id.* 483 U.S. at 176, 107 S.Ct. at 2779. In making these determinations, however, the Court ruled that trial courts may rely on both the hearsay statements and the independent evidence presented. *Id.* 483 U.S. at 181, 107 S.Ct. at 2782. *See also United States v. Peveto,* 881 F.2d 844, 853 (10th Cir.1989). The Court based its ruling on Fed.R.Evid. 104, which "allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege" in determining preliminary questions of admissibility. *Bourjaily,* 483 U.S. at 175, 107 S.Ct. at 2780. Thus, a trial court is not limited to independent evidence in making its preliminary factual determinations under the *Bourjaily* holding. *See United States v. Mobile Materials, Inc.,* 881 F.2d 866, 869 (10th Cir. 1989).

Title 12 O.S.1981, § 2105(A), although modeled after Fed.R.Evid. 104, was amended by deleting the second sentence of Rule 104 which provides that the court "[i]n making its determination ... is not bound by the rules of evidence except those with respect to privileges." However, we believe "that no change in substance was effected by this amendment...." *See* 1 Whinery, *Oklahoma Evidence* 26 (1985) (Comparison to Proposed Rule and Federal Rule). As Professor Whinery recognized:

Section 2103(B)(1) provides, as does its counterpart Federal Rule 1101(d)(1), that the rules of evidence other than those with respect to privileges do not apply in determining preliminary questions of fact.... Accordingly, the second sentence [would have been] duplicitous and unnecessary. The Advisory Committee's Note to Federal Rule 1101(d)(1) corroborates this conclusion in that it acknowledges that the second sentence of Federal Rule 1101(d) restates, for convenience, the provisions of the second sentence of Federal Rule 104(a) dealing with the determination of preliminary questions of fact.

*Id.,* at 26–27.

Finding that § 2105(A) is in substance identical to Federal Rule 104(a), we now examine the *Bourjaily* Court's rationale for allowing the examination of hearsay in the making of a preliminary factual determination. *Inter alia,* the Court stated:

[I]ndividual pieces of evidence, insufficient in

themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts. Taken together, these propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence. A *per se* rule barring consideration of these hearsay statements during preliminary factfinding is not therefore required. Even if out-of-court declarations by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary

worth as revealed by the particular circumstances of the case. Courts often act as factfinders, and there is no reason to believe that courts are any less able to properly recognize the probative value of evidence in this particular area. *Bourjaily,* 483 U.S. at 179–80, 107 S.Ct. at 2781.

■ We agree with the reasoning set forth above and hold that a trial court may consider the statements of an alleged co-conspirator in determining whether the prosecution has made the requisite factual showing under § 2801(4)(b)(5).[3] Insofar as the standard announced in *Laske* is inconsistent with this opinion, it is hereby modified.

Turning to the instant case, appellants contend that the State failed to prove that a conspiracy existed prior to introducing Ms. Davis' testimony. They also claim that the trial court failed to make the requisite threshold determination, based upon substantial independent evidence, that a conspiracy existed before admitting the testimony at issue. As a result of these alleged failures, appellants assert that the jury heard the hearsay before the independent evidence.

■ Initially, we agree with appellants that reversible error may well occur when co-conspirator hearsay evidence is presented to the jury before independent evidence is admitted. *Laske,* 694 P.2d at 539. If a co-conspirator's hearsay statement is admitted prior to the independent evidence, and the State does not subsequently satisfy the evidentiary predicates for admissibility, then the court is faced with instructing the jury to disregard the statement or, in appropriate circumstances, granting a mistrial if a cautionary instruction will not suffice to cure the prejudice caused by admitting the statement into evidence. *See People v. Montoya,* 753 P.2d 729, 734 (Colo. 1988). Moreover, there exists the danger

that conditionally admitted hearsay, combined with other evidence subsequently admitted, will blend such "that there [will be] no distinction between hearsay and non hearsay." *Laske,* 694 P.2d at 539 (quoting *United States v. Stipe,* 653 F.2d at 449). Notwithstanding the existence of recent federal decisions which allow such procedure, *see, e.g., Mobile Materials, Inc.,* 881 F.2d at 869, we decline to abandon that portion of our *Laske* decision which mandates that independent evidence be presented to the jury before co-conspirator hearsay testimony is admitted.

■ We do not agree, however, with appellant's assertion that the jury heard the hearsay before the independent evidence or that the trial court erred in making its threshold determination that a conspiracy existed. The present record does not reveal whether the trial court made the requisite preliminary determination regarding the admissibility of the statements at issue prior to their admission. While it is our opinion that trial courts should make a record of these requisite factual determinations, out of the hearing of the jury, we do not find that the omission of such in the instant case amounted to reversible error.

■ Prior to calling Ms. Davis as a witness, the State presented evidence that, on the night of June 26, 1986, Michael Fish was accompanied by Paula Wright to the Wright's home, Marty Langley borrowed a baseball bat from a neighbor, a man yelled for help during a fight which involved several people at the Wright's home, and Paula Wright and one of her sons later attempted to retrieve Fish's personal belongings from the home of Teresa Landsaw. The State also established that Fish's murdered body was discovered floating in a creek the next day. Davis' nonhearsay testimony corroborated this evidence and revealed additional activity by appellants on

---

**3.** The *Bourjaily* Court specifically declined to decide whether a court could rely solely on hearsay statements to determine that a conspiracy has been established by a preponderance of the evidence. *Bourjaily,* 483 U.S. at 176, 107 S.Ct. at 2781–82. While we adopt the new standard announced therein, it is the opinion of this

Court that the need for some quantum of independent evidence has not been eliminated. Simply stated, we hold that hearsay evidence alone cannot provide the sole basis for establishing the foundational requirements of § 2801(4)(b)(5).

the night of the murder. Considering the aforestated independent evidence *and* the hearsay testimony elicited from Ms. Davis, *see Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2782, we find that the trial court properly admitted the statements at issue. Specifically, we deem that there was ample support for the trial to find, by a preponderance of the evidence, that (1) a conspiracy existed, (2) the declarants and the defendants against whom the declarations were offered were members of the conspiracy, and (3) the statements were made in the course and in furtherance of the conspiracy. Correspondingly, we find that the hearsay testimony was not introduced prior to the admission of the independent evidence. This assignment of error is therefore dismissed.

Appellants finally argue that the trial court erred in failing to instruct the jury that Angela Davis was an accomplice to both the conspiracy charge and the charge of murder. In support thereof, appellants emphasize that Davis knew Fish was to be robbed, told a passing motorist who stopped to inquire about the fight to go on because "it was a family quarrel", accompanied appellants when they transported the victim, received some of the stolen cocaine, and helped clean up blood in the Wright's car. While an accomplice instruction may well have been required had appellants been tried for robbery, robbery by force, assault or some other offense, we do not find that an accomplice instruction was mandated in the instant case.

■ The test to determine whether a witness is an accomplice is whether she could be indicted for the offense for which the accused is being tried. *Mills v. State*, 737 P.2d 573, 574 (Okl.Cr.1987). The appellants in the present case were tried for Conspiracy to Commit Murder and First Degree Murder. Nothing in the record before us indicates that Davis knew Fish was to be murdered or that she personally had any design to effect Fish's death. *See* 21 O.S.Supp.1982, § 701.7(A). Accordingly, we find that Davis was not an accomplice to either the crime of conspiracy or the crime of murder, and that the trial court

did not err in refusing appellants' requested instructions. *See Mills*, 737 P.2d at 574. Therefore, this assignment is without merit.

Finding no error warranting modification or reversal, the Judgments and Sentences are AFFIRMED.

LANE, V.P.J., and BRETT, LUMPKIN and JOHNSON, JJ., concur.