**UNITED STATES of America, Plaintiff,**

**v.**

**Harold K. HAGEN, Defendant.**

**No. CR. 90–0–137.**

United States District Court,
D. Nebraska.

Aug. 13, 1991.

Robert F. Kokrda, Asst. U.S. Atty., for plaintiff.

James E. Durr, Fort Collins, Colo., for defendant.

Don Stenberg, Atty. Gen., Linda L. Willard, Asst. Atty. Gen., Lincoln, Neb., for intervenor.

## ORDER

STROM, Chief Judge.

This matter is before the Court on the magistrate judge's initial (Filing No. 26) and supplemental (Filing No. 36) findings and recommendations that the information filed against defendant, Harold K. Hagen, be dismissed. The United States of America, the State of Nebraska as intervenor,

and Hagen have each objected to various portions of the initial and supplemental findings and recommendations (Filing Nos. 28, 29, 30, 37 and 38). Having conducted a *de novo* review of those portions of the findings and recommendations to which objections have been made, *see* 28 U.S.C. § 636, the Court generally adopts the magistrate judge's findings and recommendations as set forth in Filing No. 26 and as supplanted and supplemented in Filing No. 36, particularly those findings with respect to the adequacy of the government's information in light of the requirements specified in Fed.R.Crim.P. 7(c)(1).

■ The government requests that, should the Court adopt the findings and recommendations of the magistrate judge, the Court permit an amendment of the information as provided for in Fed. R.Crim.P. 7(e). Rule 7(e) provides:

> The court may permit an information to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.

Fed.R.Crim.P. 7(e). *See generally* 1 C. Wright, *Federal Practice & Procedure* § 128 (1982). The Court finds that defendant would not be prejudiced by the filing of an amended information, given that these proceedings are at their very earliest stages. In addition, amendment would not add additional offenses to the crimes charged in the present information but, rather, would serve to "state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated." Fed.R.Crim.P. 7(c)(1). Accordingly,

IT IS ORDERED that the findings and recommendations of the magistrate judge as embodied in Filing No. 26 and as supplanted and supplemented in Filing No. 36 are adopted; the United States of America is granted until August 30, 1991, to file an amended information in this matter, or this action will be dismissed.

## REPORT, RECOMMENDATION AND ORDER

DAVID L. PIESTER, United States Magistrate Judge.

Pending before the court are defendant's motions to dismiss the information, filings 14 and 20. Because one of the defendant's motions raised an issue of constitutionality of Neb.Rev.Stat. § 37–505, this court granted the State of Nebraska leave to intervene. See filings 21 and 22. All parties have submitted their respective briefs on the motions and an evidentiary hearing was held on Thursday, April 25, 1991 on several of defendant's challenges to the information.

The defendant is charged with violations of the Lacey Act, 16 U.S.C. § 3371 et seq., which regulates the taking, possession, transportation, and sale of fish and wildlife in interstate commerce. Specifically, the information herein charges the defendant with four counts of transporting and selling rainbow trout in interstate commerce in violation of 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(2), and Neb.Rev.Stat. § 37–505.

Section 3372(a)(2)(A) provides, in relevant part:

> It shall be unlawful for any person—
>
> \* \* \* \* \* \*
>
> (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—
> (A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law....

The state law alleged to have been violated is set forth in the information as Neb.Rev. Stat. § 37–505 (Reissue 1988) which states:

> 37–505 Game animals, birds, or fish; possession or sale prohibited; exceptions; permits; fish dealer's regulations; fee. It shall be unlawful to buy, sell, or barter (1) any game bird or part thereof, except the feathers or skins from legally taken upland game birds, (2) any antelope, cottontail rabbit, deer, elk, squirrel, or bullfrog, except that deer, antelope, or elk hides from legally taken animals may be sold, or (3) *any game fish protected by*

*this act at any time, whether killed or taken within or without this state.* It shall be unlawful for any commercial institution, commission house, restaurant, or cafe keeper to have in its, his, or her possession at any time game birds or game animals protected by this act. *Game fish lawfully shipped in from without the state, by residents of this state, or game or fish lawfully acquired from a lawful game farm or a person having a fish culture permit may be sold in this state.* The burden of proof shall be upon every such dealer and keeper to show by competent and satisfactory evidence that any game or game fish in his or her possession or sold by him or her was lawfully imported from without the state or was lawfully from a licensed game farm or a person having a fish culture permit. *Nonresidents holding a valid nonresident fish dealer's permit may possess, buy sell, transport, and ship live bait minnows, live fish, all frogs, and crayfish, legally obtained from without this state or from a licensed fish hatchery, in accordance with the regulations of the Game and Parks Commission. The fee for a nonresident's fish dealer's permit shall be one hundred dollars.*

(Emphasis added). As noted by the defendant, § 37–505, as amended in 1989, now provides that the fee for a nonresident's fish dealer's license is four hundred dollars. Neb.Rev.Stat. § 37–505 (1990 Cum.Supp.). The dates of the alleged violations as stated in the information herein are all within 1986.

The defendant is also charged with a violation of 16 U.S.C. § 3373(d)(2) which states:

Any person who knowingly engages in conduct prohibited by any provision of this chapter (other than section 3372(b) of this title) and in the exercise of due care should know that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under any underlying law, treaty, or regulation shall be fined not more than $10,000, or imprisoned for not more than one year, or both. Each

violation shall be a separate offense and the offense shall be deemed to have been committed not only in the district where the violation first occurred, but also in any district in which the defendant may have taken or been in possession of the said fish or wildlife or plants.

The criminal counts filed against this defendant allege, in essence, that on four separate occasions in 1986 the defendant knowingly transported, caused to be transported, and sold in interstate commerce certain rainbow trout which were possessed, transported and sold in violation of the laws and regulations of the state of Nebraska, specifically Neb.Rev.Stat. § 37–505. The government alleges that the defendant, doing business in the state of Colorado as Hagen Western Fisheries, transported and sold rainbow trout in the state of Nebraska without obtaining a "fish dealer's permit" as required by § 37–505 (Reissue 1988).

The defendant was originally charged under the identical federal statutes but that information was based upon alleged violations of Neb.Rev.Stat. §§ 37–705 and 37–719. (CR 90–O–36). That case was dismissed without prejudice by the plaintiff and the charges have now been refiled by the present information charging the defendant with violating Neb.Rev.Stat. § 37–505.

The defendant has filed two motions to dismiss the information, filing 14 and 20, which will be discussed in order. In his first motion the defendant raises four grounds for dismissal:

I. The information filed is defective as it does not allege essential facts constituting a violation of Title 16, United States Code, Sections 3372(a)(2)(A) and 3373(d)(2) and a violation of Neb.Rev. Stat. Sec. 37–505 (Reissue 1988).

II. The language of the underlying Nebraska Statute (Neb.Rev.Stat. Sec. 37–505 (Reissue 1988) is unconstitutionally vague.

III. The Nebraska regulatory scheme over interstate commerce in aquaculture, i.e. privately owned hatchery-raised

trout, violates the Commerce Clause of the United States Constitution.

IV. This application of 16 U.S.C. 3372(a)(2)(A) and 16 U.S.C. 3373(d)(2) violates the Fifth and Eighth Amendments of the United States Constitution.

In his second motion, defendant raises:

V. Prosecutorial misconduct by failing to exercise independent discretion in the required pursuit of justice.

VI. The defendant has been a victim of selective prosecution.

## CLAIM I

The defendant first alleges that the information filed herein is defective in that it fails to adequately allege essential facts which would constitute a violation of 16 U.S.C. § 3372(a)(2)(A) and § 3373(d)(2) and Neb.Rev.Stat. § 37–505.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that a proper indictment consist of "a plain, concise and definite written statement of the essential facts constituting the offense charged." The standard for judging the sufficiency of an indictment is whether it

> first, contains the elements of the offense charged and fairly informs a defendant of the charge against him which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

*Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Lame,* 716 F.2d 515, 518 (8th Cir.1983).

The defendant appears to complain that the information merely cites the relevant underlying state statute, § 37–505, which forms the basis of the Lacey Act prosecution, and fails to specify the conduct which is prohibited by state law. While the defendant is correct that this information fails to specify which provision of § 37–505 is alleged to have been violated, and is further correct that the statute relates to more than one prohibited act, it seems clear from the facts of this case, and the defendant's own argument relating to the Commerce Clause, that he is aware of the prohibited actions with which he is charged.

As can be seen from the language of § 37–505, quoted above, that statute regulates the buying, selling, and bartering of game birds, game animals, and game fish with certain exceptions which are then noted in the remaining language. It is clear from the information that the defendant is charged with transporting and selling *fish* in interstate commerce in violation of § 37–505. The defendant does not argue and the government does not allege that he is a resident of the state of Nebraska. Therefore the language of the statute leaves only one possibility of the prohibited acts alleged to have been violated: the act of a nonresident transporting and selling "live fish" without a "valid nonresident fish dealer's permit." While I agree that the government could have been more specific in its allegations, I cannot conclude that this information is defective simply because it does not specifically identify that the defendant was a nonresident and did not have a valid nonresident fish dealer's permit. Only one provision of § 37–505 applies in this case and that provision is clear from the mere fact that the defendant is not a resident of Nebraska.

## CLAIM II

The defendant also alleges that § 37–505 is unconstitutionally vague and therefore cannot be the basis for a Lacey Act prosecution. I cannot agree. The Eighth Circuit has stated the applicable test as follows:

> The fundamental test applied to criminal laws challenged as unconstitutionally vague is whether "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Baggett v. Bullitt,* 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964); see also *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). This test considers whether fair notice of the conduct prohibited is given, *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), and whether the

statute provides sufficient guidance to officials so that "arbitrary and discriminatory enforcement" is avoided. *Id.* at 357, 103 S.Ct. at 1858; see also *Papachristou v. City of Jacksonville,* 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972). Finally, the statute must be sufficiently clear so that the exercise of constitutionally protected rights is not restrained. *See, Colautti v. Franklin,* 439 U.S. 379, 390–91, 99 S.Ct. 675, 683–83, 58 L.Ed.2d 596 (1979); *Grayned,* 408 U.S. at 109, 92 S.Ct. at 2299.

*Planned Parenthood of Minnesota v. State of Minnesota,* 910 F.2d 479, 482 (8th Cir.1990).

I am convinced that a person of common intelligence could surmise from § 37–505 that he or she, if not a resident of the state of Nebraska, must obtain a valid nonresident fish dealer's permit before fish could be transported or sold in Nebraska. It is clear from the language of 37–505 that fish, as well as other wildlife, may not be transported or sold in Nebraska unless such sale falls within the "resident" or "nonresident" exception set forth therein.

The defendant also attempts to establish the statute's vagueness by challenging the language set forth in the statute's first four sentences, which as I noted above in my discussion of Claim I, are inapplicable to this case. In order to challenge either the vagueness of a statute, or any other alleged constitutional infirmity, the party challenging that statute must show that he or she "suffered an 'actual or threatened injury'" redressable by the courts. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Alexander v. City of Minneapolis,* 928 F.2d 278, 281 (8th Cir.1991); *United Food & Com. Workers Intern. v. IBP, Inc.,* 857 F.2d 422, 426 (8th Cir.1988) "Statutes should not be declared unconstitutionally vague by speculating about possible hypothetical applications." *Planned Parenthood of Minnesota,* 910 F.2d at 482. In this case the defendant is not being charged with any of the provisions set forth in the statute's first four

sentences, and he therefore has no standing to challenge the validity of those prohibitions. *Alexander,* 928 F.2d at 281.

### CLAIM III

The defendant alleges in this claim that § 37–505 is unconstitutional in that it violates Art. I, § 8 of the United States Constitution, more commonly known as the Commerce Clause. In addition, at the evidentiary hearing in this matter the defendant also raised a challenge based upon the Privileges and Immunities Clause, Art. IV, § 2.

The Commerce Clause of the Constitution grants Congress the power "[t]o regulate Commerce with foreign nations, and among the several states, and with Indian Tribes." Art. I, § 8, cl. 3. "Although the Clause thus speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the power of the states to erect barriers against interstate trade." *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 35 [100 S.Ct. 2009, 2015, 64 L.Ed.2d 702] (1980).

*Maine v. Taylor,* 477 U.S. 131, 137, 106 S.Ct. 2440, 2446–47, 91 L.Ed.2d 110 (1986)

In *Taylor* the Court applied the Commerce Clause analysis to a case involving the federal statutes at issue here, the Lacey Act Amendments of 1981, 16 U.S.C. § 3371 et seq. At issue in *Taylor* was a state statutory ban on the importing of live baitfish. The State of Maine intervened to defend the validity of its statutes, arguing that the ban was necessary to "protect the State's fisheries from parasites and non-native species that might be included in the shipments of live baitfish." *Taylor,* 477 U.S. at 133, 106 S.Ct. at 2444.

The Court in *Taylor* pointed out:

The limitation imposed by the Commerce Clause on the state regulatory power "is by no means absolute," and "the States retain authority under their general police power to regulate matters of 'legitimate local concern' even though interstate commerce may be affected." *Id.* [447 U.S.] at 36 [100 S.Ct. at 2015].

477 U.S. at 138, 106 S.Ct. at 2447. Indeed, the Court in *Taylor* upheld Maine's total ban on the importation of live baitfish, a clear impediment to the free flow of interstate commerce, because the state provided sufficient evidence, in accordance with the standard set forth in *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), that (1) the statute served a legitimate local purpose, and (2) the purpose was one which could not have been served as well by available nondiscriminatory means. *Taylor,* 477 U.S. at 140–51, 106 S.Ct. at 2448–54.

The plaintiff and the State of Nebraska argue that the strict scrutiny test is inapplicable in this case. It is argued that Nebraska does not, as did Maine in *Taylor,* ban the importation of fish from other states; rather, as applicable in this case, it merely required that a nonresident fish dealer obtain a permit, at a cost of $100.00, prior to the transportation and sale of such fish in Nebraska. These parties argue that this permit requirement is merely an "incidental" burden on interstate commerce and is not "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174.

The evidence is inconclusive as to what financial effect, if any, is caused by the disparity in permit fees. It is unknown, for example, whether the $100.00 fee would approximate anticipated profits on one "typical" shipment of fish or several, or merely a minuscule part of such profits, because there is no such thing as a "typical" shipment. However, from the testimony that the number of nonresident permits dropped significantly in 1990 corresponding with the rise in nonresident permit fees, while the number of resident permits continued to rise, I infer that, at least for comparatively small dealers, the amount of $100.00 was significant.

The testimony of Kenneth Cline, a Colorado fish hatchery owner who had his Nebraska hatcheries permitted in the names of their resident managers to avoid the ban on nonresidents obtaining "fish culturist" permits implies that there was some economic benefit, other than simply the disparate fees, resulting from the State's preference for resident importers. There is no direct evidence, however,—other than the fact of this prosecution itself—that the $100.00 permit fee was or was not a detriment to nonresidents wishing to sell fish—even one load per year—in Nebraska.

The defendant argues that strict scrutiny must apply in this case because the Nebraska regulatory scheme, and specifically § 37–505, is discriminatory "on its face and in its practical effect," *Taylor,* in that residents may transport and sell fish without such a permit. The defendant's argument is well taken. As set forth below, the statutory scheme established in Nebraska to regulate the importation of fish is discriminatory on its face and in its practical effect, and therefore is subject to the more exacting "strict scrutiny" test of *Hughes v. Oklahoma, supra.*

The Nebraska statutes, as well as the testimony at the hearing, demonstrate that two types of permits control the importation of live fish into the State of Nebraska. Neb.Rev.Stat. § 37–705 provides that a "fish culture permit" may be obtained, in accordance with §§ 37–703 and 704, in order to "propagate and raise ... fish" in a fish hatchery located in Nebraska. This "fish culture permit" may be obtained only by Nebraska residents, see §§ 37–702 and 705. Section 37–705, as argued by the State of Nebraska in this case, controls the importation of fish into the state by residents of Nebraska, and requires the payment of twenty dollars per year.

Section 37–705 provides, in relevant part: Upon payment of the permit fees as required by this act, ... game fish or minnows, lawfully held in possession in any other state or country, may be imported into this state *by any legal holder of a breeder's permit described in sections 37–703 and 37–704 ....* [1]

1. Testimony established that the "breeder's permit" is synonymous with the "fish culture permit," available only to Nebraska residents.

For nonresidents the importation of fish is controlled by § 37–505, quoted in its entirety above. Upon application and payment of a fee of $100.00 in 1986, a nonresident could "possess, buy, sell, transport, and ship ... live fish, ... legally obtained from without this state or from a licensed fish hatchery, in accordance with the regulations of the Game and Parks Commission."

Aside from these two permits explicitly provided for by these statutes, the language of § 37–505 itself appears to allow *any* resident of Nebraska to engage in the transportation and sale of live fish, even in the absence of a permit. The statute states:

> Game fish lawfully shipped in from without the state, by *residents* of this state, or game or fish lawfully acquired from a lawful game farm or a person having a *fish culture permit* may be sold in this state.

(Emphasis added). When one compares § 37–705 with § 37–505, there are no provisions which mandate that *only* residents who are holders of a "fish culture permit" may import fish into this state. Indeed, § 37–505 allows *any* resident to import fish from without the state and sell those fish as long as the fish were "lawfully shipped in from without the state" or were "lawfully acquired from a lawful game farm or a person having a fish culture permit." The testimony of Wesley F. Sheets, Chief of Fisheries with Nebraska Game and Parks Commissions, verified such an interpretation of the statute.

> Q. [The Court] To your knowledge, is there anything that would prohibit a Nebraska resident who does not have a fish culture permit from importing fish from another state that were lawfully produced in that state?
>
> A. To my knowledge, I don't believe there would be any prohibition as long as he acquired the fish in a legal, lawful manner, from wherever he acquired them.

(Requested Transcript at 3:16–24). Thus at the time of the charged offenses, the Nebraska statutes provided (1) a nonresident could import and sell fish in this state only if he or she obtained a "fish dealer's permit" at a cost of $100.00; (2) a resident engaged in the fish hatchery or fish propagation business holding a "fish culturist permit," at an annual cost of $20.00, could import fish from "without this state," and (3) *any* resident not normally engaged in the fish propagation industry, i.e., not holding a "fish culturist permit," could sell fish within this state if they were lawfully purchased in another state.

From the face of the statutes, as well testimony at the evidentiary hearing, I conclude that this statutory scheme is clearly in violation of both the Commerce Clause and the Privileges and Immunities Clause of the Constitution. The statute relating to the importing of fish plainly discriminates against nonresident fish dealers. Residents of the state of Nebraska, on the other hand, may import fish for sale if (1) they are holders of a "fish culturist permit," at a fee of $20.00, or (2) if the resident is not a "fish culturist," (that is, has no permit of any type) provided the fish are lawfully acquired elsewhere. Comparing the nonresident fee with either of the provisions applicable to residents, it is apparent that nonresident fish dealers are economically disadvantaged by the higher fee requirement. In 1986, at a fee of $100.00, nonresidents were required to pay five times the amount required of "fish culturist" residents, and today are required to pay twenty times the resident permit rates.[2] In addition, a "non-fish culturist" resident may at no charge import fish into Nebraska for resale.

As noted above, the defendant has challenged the predicate Nebraska statute as violating both the Commerce Clause and the Privileges and Immunities Clause. The Supreme Court has previously noted that the operation of the Privileges and Immunities Clause and the Commerce Clause is not

---

**2.** Although not clear from § 37–505, the testimony of Wesley Sheets indicates that the fee for a nonresident fish dealer's permit is an annual fee. Section 37–705 explicitly states that the $20.00 fish culture permit fee is a yearly fee.

identical, *United Building & Constr. Trades v. Mayor & Council of the City of Camden,* 465 U.S. 208, 218–19, 104 S.Ct. 1020, 1027–28, 79 L.Ed.2d 249 (1984). However, the distinction between the two clauses has been made principally in cases where a governmental entity is found to be a "market participant" rather than a "market regulator," *Id.* at 219–20, 104 S.Ct. at 1028. In "market participant" cases, a regulation or statute may be sustained against a Commerce Clause challenge, but that same regulation may still be held to violate the Privileges and Immunities Clause. *United Building, supra* at 220, 104 S.Ct. at 1028. In this case, however, it is not alleged, nor could it be, that the state was a "market-participant."

In "market-regulator" cases the Court has noted the "mutually reinforcing relationship between the Privileges and Immunities Clause and the Commerce Clause—a relationship that stems from their common origin in the Fourth Article of the Articles of Confederation and their shared vision of federalism." *Hicklin v. Orbeck,* 437 U.S. 518, 531–32, 98 S.Ct. 2482, 2490–91, 57 L.Ed.2d 397 (1978). As stated by one district court, this relationship "renders a number of cases decided under the privileges and immunities clause relevant to ... commerce clause challenge[s]." *Service Emp. Int. Union, Loc. 82 v. Dist. of Columbia,* 608 F.Supp. 1434, 1439 n. 4. (D.D.C.1985). Indeed, the *Hicklin* Court relied upon Commerce Clause cases for support of its conclusion that an "Alaska Hire" statute, which gave employment preference to Alaska residents for jobs in the oil and gas pipeline industry, violated the Privileges and Immunities Clause. Therefore, it is instructive in this case to examine both Privileges and Immunities Clause, as well as Commerce Clause, precedent, in scrutinizing Nebraska's commercial fish import statutes.

In *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), the Court held that a South Carolina statute, which required nonresident shrimp boat owners to pay a license fee of $2,500 while charging residents $25.00, was violative of the Privileges and Immunities Clause, because South Carolina could show no reasonable relationship between the alleged danger to the state's shrimp population and the severe discrimination practiced against nonresidents. Two members of the Court concurred with the majority except in the Privileges and Immunities holding, and wrote separately to emphasize that the invalidity of the statute should rest upon it being in violation of the Commerce Clause. 334 U.S. at 407–09, 68 S.Ct. at 1167–68 (Frankfurter, J., and Jackson, J., concurring).

Again, in *Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952), the Court held that an Alaska statute providing for a five dollar resident commercial fisherman fee and a fifty dollar nonresident fee was violative of the Privileges and Immunities Clause. The basis of the Ninth Circuit's holding of statutory invalidity was the Commerce Clause, *Anderson v. Mullaney,* 191 F.2d 123, 133 (9th Cir.1951), and that court found it unnecessary to decide the Privileges and Immunities Clause question. The statute was challenged on the basis of both constitutional provisions, 342 U.S. at 416, 72 S.Ct. at 429, yet the Supreme Court, with no explanation, based its affirmance of the circuit court's holding on the Privileges and Immunities Clause rather than the Commerce Clause. The Supreme Court merely cited *Toomer,* a privileges and immunities clause case, as authority for its holding and affirmed.

As the Ninth Circuit noted in *Mullaney,* cases involving disparate fees or taxes upon nonresident business persons are reminiscent of the infamous "drummer" cases decided many years ago by the Supreme Court. The circuit court made reference to those cases in the following passage:

> Many cases have involved State taxes upon "drummers." Such taxes have found condemnation because of the discrimination which results from their "practical operation." Referring to them the court said in *Nippert v. Richmond* [327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760 (1946)], [ ... ] at pages 424–25, [66 S.Ct. at page 590]: "Thus the essence of the distinction in the Berwind–White case

[ (*McGoldrick v. Berwind–White,* 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940) ] was that the taxes outlawed in the drummer cases in their practical operation worked discriminatorily against interstate commerce to impose upon it a burden, either in fact or by the very nature of its incidence, which they did not place upon competing local business and which New York sales tax did not create. (Citations omitted)

"As has been so often stated but nevertheless seems to require constant repetition, not all burdens upon commerce, but only undue *or discriminatory* ones, are forbidden. For, though 'interstate business must pay its way,' a state consistently with the commerce clause cannot put a barrier around its borders to bar out trade from other states and thus bring to naught the great constitutional purpose of the fathers in giving [to Congress] the power 'To regulate Commerce with foreign Nations, and among the several States * * * '. Nor may the prohibition be accomplished in the guise of taxation which produces the excluding or discriminatory effect."

*Mullaney,* 191 F.2d at 129–30.

In *Service Emp. Int. Union, supra,* the district court held unconstitutional a District of Columbia statute which required nonresident street vendors to post a $1,500.00 bond while residents were required to post a bond of only $500.00. The District argued that the bond requirement was to "ensure the payment of sales tax by street vendors," and justified the disparity by its inability to "distrain the goods of nonresident vendors in the event that they fail to pay or underpay sales taxes on merchandise they sell in the District." 608 F.Supp. 1434, 1438 (D.D.C.1985). The court stated:

> Although the city may need to establish only a "rational relation" between a higher bond and the District's problems with enforcing the sales tax requirements against nonresident vendors to survive an equal protection challenge …, it is equally well-established that an ordinance which discriminates on its face on the basis of residency must more nearly

"fit" the purposes for which it was enacted when challenged as a violation of the commerce clause or the privileges and immunities clause of article IV, particularly when the challenged regulation interferes with the nonresident's livelihood. *See, Hicklin v. Orbeck,* 437 U.S. 518, 524, 98 S.Ct. 2482, 2487, 57 L.Ed.2d 397 (1978); *Baldwin v. Fish & Game Commission of Montana,* 436 U.S. 371, 383, 387, 98 S.Ct. 1852, 1860, 1862, 56 L.Ed.2d 354 (1978); *Toomer v. Witsell,* 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). When a local regulation overtly discriminates against an out-of-state business interest, the burden falls upon the state to justify the discrimination "both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *See Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977), *Dean Milk v. City of Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951). Although neither the commerce clause nor the privileges and immunities clause precludes disparity of treatment when there are valid, independent reasons for it, *see e.g., Toomer,* 334 U.S. at 396, 68 S.Ct. at 1162, the Constitution mandates that the court examine closely statutes or regulations which practice overt discrimination against citizens of other states. The "fit" required of such provisions must be measured both in terms of under- and over-inclusiveness and by the presence or absence of any nondiscriminatory alternatives open to the District.

608 F.Supp. 1434, 1439.

For purposes of defendant's Hagen's Commerce Clause argument the applicable test was stated in *Maine v. Taylor, supra,* as follows:

> In determining whether a State has overstepped its role in regulating interstate commerce, this Court has distinguished between state statutes that burden interstate transactions only incidentally, and those that affirmatively discriminate

against such transactions. While statutes in the first group violate the Commerce Clause only if the burdens they impose on interstate trade are "clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970), statutes in the second group are subject to more demanding scrutiny. The Court explained in *Hughes v. Oklahoma,* 441 U.S., at 336 [99 S.Ct., at 1736], that once a state law is shown to discriminate against interstate commerce "either on its face or in practical effect" the burden falls on the State to demonstrate both that the statute "serves a legitimate local purpose," and that this purpose could not be served as well by available nondiscriminatory means. (Citations omitted).

477 U.S. at 138, 106 S.Ct. at 2447.

Despite arguments by the State of Nebraska to the contrary, I conclude that Nebraska's regulatory scheme at issue here falls into the second category of cases, ones in which state statutes affirmatively discriminate against interstate transactions. Therefore I reject the State's argument that this case is governed by the "incidental burden" test set forth in *Pike v. Bruce Church, Inc., supra.* Instead, the defendant has shown that the statutory scheme at issue, a portion of which forms the basis of the Lacey Act violations with which he is charged, is facially discriminatory, and therefore the State must show (1) that it serves a legitimate local purpose, and (2) the purpose could not be served as well by available nondiscriminatory means. *Hughes v. Oklahoma, supra.*

The State argues that any discriminatory effect of its statutory scheme is valid because it has the authority, even in the face of the Commerce Clause, to "control the type and condition of fish arriving in the state in order to protect native species from the introduction of new diseases and competing non-native species which may threaten or endanger native species of fish." (Brief of Intervenors at 3). Indeed such an argument has been found to qualify as a legitimate local purpose. *Hughes v.*

*Oklahoma, supra,* There the Court explicitly supported such an argument:

We consider the States' interests in conservation and protection of its wild animals as legitimate local purposes similar to the States' interests in protecting the health and safety of their citizens.

441 U.S. at 337, 99 S.Ct. at 1737. That very purpose was the basis upon which the Court in *Taylor* sustained Maine's law banning the import of live baitfish. Indeed the Court in *Taylor* held that "Maine has a legitimate interest in guarding against imperfectly understood environmental risks, despite the possibility that they may ultimately prove to be negligible." 477 U.S. at 148, 106 S.Ct. at 2452.

Thus, the state of Nebraska's position is legitimate as it exists in a theoretical vacuum. However, that argument must be analyzed in conjunction with the regulations at issue in this case. The question is not whether Nebraska is authorized to regulate the importation of fish and wildlife. The crucial question, for purposes of the Commerce Clause inquiry, is whether the regulations at issue, specifically the fees imposed upon nonresidents who import fish compared to those charged residents, serve to further the State's legitimate interest in regulating the importation of fish.

The evidence establishes that the disparity between the fees bears no relationship whatsoever to furthering the State's goal of protecting its native fish populations. First, the state wholly failed in its brief and at the evidentiary hearing in this matter to assert any justification for the fee disparity between resident "fish culture permits" and nonresident "fish dealer's permits." Wesley Sheets testified that the fees charged for these two permits were in no way related to the cost of regulatory enforcement for these permits, and further testified that there was no particular added cost or time for regulating nonresident fish importers. Sheets also testified that the Nebraska Game and Parks Commission's rules and regulations for the importation of fish were essentially the same for both residents and nonresidents.

Furthermore, the state offered no explanation as to why it completely fails to regulate the importation of fish by all other residents, i.e., those residents without "fish culture permits." This glaring lack of regulation surely serves to make a mockery of the state's asserted concern for the health and vitality of its fisheries. In this case, it would seem that defendant Hagen could have sold his fish to Nebraska buyers in Colorado, and those Nebraska resident, "non-fish culturists" could have then brought the fish into Nebraska for their purposes with no permit required and no inspection for disease.

Moreover, there is no evidence that a nonresident's $100.00 permit ensures or even has any relationship to fish health, much less one that would be greater or lesser than that stemming from a resident's $20.00 permit. Simply put, the State of Nebraska has wholly failed to meet its burden of showing that the challenged statutory scheme for the regulation of imported fish, with its inflated nonresident fee requirement, serves any legitimate local purpose, and, as well, there is no evidence to indicate that the state's purpose of protecting its fisheries and natural resources could not be met by available nondiscriminatory means such as equally valued permit costs. *Hughes v. Oklahoma, supra.* Therefore, I conclude that the Nebraska statutory scheme at issue herein is in violation of the Commerce Clause.

In this case, not only does the Nebraska regulatory scheme offend the dictates of the Commerce Clause, I also conclude that the regulations violate the Privileges and Immunities Clause as well. As the Supreme Court noted in *United Building & Constr. Trades v. Mayor and Council of the City of Camden,* 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984):

> The Privileges and Immunities Clause ... imposes a direct restraint on state action in the interests of interstate harmony. (Citations omitted). This concern with comity cuts across the market-regulator participant distinction that is crucial under the Commerce Clause. It is discrimination against out-of-state residents on matters of fundamental concerns

which triggers the Clause, not regulation affecting interstate commerce.

465 U.S. at 220, 104 S.Ct. at 1028.

The test applicable to cases involving the Privileges and Immunities Clause was set forth in *United Building, supra.* A court must first "decide whether the ordinance burdens one of the many privileges and immunities protected by the Clause," *Id.* at 218, 104 S.Ct. at 1027, and, if so, whether there is a "substantial reason for the difference," *Id.* at 222, 104 S.Ct. at 1029. As to the initial inquiry the Court stated:

> Not all forms of discrimination against citizens of other States are constitutionally suspect.
>
> > "Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with respect to those 'privileges' and 'immunities' bearing upon the vitality of the nation as a single entity must the State treat all citizens, resident and nonresident, equally." (Citation omitted).
>
> As a threshold matter, then, we must determine whether an out-of-state resident's interest in employment on public works projects in another State is sufficiently "fundamental" to the promotion of interstate harmony so as to "fall within the purview of the Privileges and Immunities Clause." (Citations omitted).

465 U.S. at 218, 104 S.Ct. at 1027–28. The Court found that the Camden preferential hiring ordinance, which required private contractors on public works projects to hire at least 40% Camden residents, was indeed a burden upon one of the privileges and immunities protected by the Clause. In reaching its result the Court noted:

> Certainly, the pursuit of a common calling is one of the *most fundamental* of those privileges protected by the Clause. Many if not most of our cases expounding the Privileges and Immunities Clause

have dealt with this basic and essential activity.

*Id.* at 219, 104 S.Ct. at 1028. (Emphasis added).

As to the second step of the inquiry the Court stated:

> The conclusion that Camden's ordinance discriminates against a protected privilege does not, of course, end the inquiry. We have stressed in prior cases that "[l]ike many other constitutional provisions, the privileges and immunities clause is not absolute." *Toomer v. Witsell,* 334 U.S., at 396 [68 S.Ct., at 1162]. It does not preclude discrimination against citizens of other States where there is a "substantial reason" for the difference in treatment. "[T]he inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them." *Ibid.* As part of any justification offered for the discriminatory law, nonresidents must somehow be shown to "constitute a peculiar source of the evil at which the statute is aimed." *Id.,* at 398 [68 S.Ct., at 1163].

*United Building,* 465 U.S. at 222, 104 S.Ct. at 1029.

The *United Building* case itself resolves the first step in the Privileges and Immunities Clause inquiry in this case. The defendant here is in the business of selling fish commercially. As the Court noted in *United Building,* "the pursuit of a common calling is one of the *most fundamental* of [the] privileges protected by the Clause." 465 U.S. at 219, 104 S.Ct. at 1028. Neither the State of Nebraska nor the plaintiff has argued or provided evidence that the defendant was involved in any activity that could be characterized as anything other than the pursuit of his livelihood. As the Supreme Court held in *Toomer* and *Mullaney,* discussed above, when licenses necessary for the pursuit of a commercial enterprise are issued to nonresidents at fees in excess of that charged residents, the statute or regulation authorizing those fees cannot withstand a Privileges and Immunities challenge if the State can show no substantial reason for the discriminatory treatment of nonresidents.

As noted above, the Privileges and Immunities Clause does not forbid valid and justifiable discrimination against nonresidents. As the Court made clear in *Toomer, supra,* "the purpose of the clause is to outlaw classifications based on the fact of non-citizenship unless there is something to indicate that non-citizens *constitute a peculiar source of evil* at which the statute is aimed." 334 U.S. at 398, 68 S.Ct. at 1163. Thus, in *Mullaney,* relying on the language from *Toomer* which discussed examples of justifiable disparity in license fees, the Court stated:

> In that case it was said: "The state is not without power, for example, to restrict the type of equipment used in its fisheries, to graduate license fees according to the size of the boats, or even to *charge non-residents a differential which would merely compensate the State for any added enforcement burden* they may impose or for any conservation expenditures from taxes which only residents pay." [*Toomer, supra,*] at 398–99 [68 S.Ct. at 1163–64]. The challenged discrimination [in *Mullaney*] does not come within any of these exceptions.

*Mullaney,* 342 U.S. at 417, 72 S.Ct. at 430. I can find no distinction between *Toomer* and *Mullaney* and the case before me today.

The State has offered no evidence, and indeed does not argue, that the cost of regulation and enforcement of nonresident importers of fish is any more than that for residents. Indeed, the testimony of Wesley Sheets confirmed that he knew of no relationship between the cost of either of the permits to the cost of enforcement and regulation of the importation of fish, those costs being essentially equal. Thus there is no evidence that the higher cost of the nonresident "fish dealer's permit" is a necessary compensation for an added cost of enforcement.

As with the Commerce Clause challenge, the only justification or purpose offered by the State of Nebraska is the generic princi-

ple that the state has the authority to regulate the importation of fish in order to preserve the integrity of its natural resources. This worthy goal, however, is in no way fostered by a discriminatory permit fee against nonresident fish dealers. In essence, the State offered absolutely *no* argument to support its disparate permit fee system. The fallacy in the state's position is particularly apparent when one considers that a "non-fish culturist" resident may, according to the statute, import fish into the state *without any permit* for unrestricted sale as long as the fish were lawfully acquired outside Nebraska. Even without that anomaly, however, the resident "fish culturist" permit allowing for fish importation requires a fee of only $20.00, while a nonresident was required in 1986 to pay $100.00 for a "fish dealer's permit." [3] Under the Privileges and Immunities Clause, according to *Toomer* and *Mullaney,* such disparity in fees cannot stand without justification. In this case no such justification has been shown. There has been no proof offered, and no argument made, that nonresident fish importers "constitute a peculiar source of evil at which the statute is aimed," nor that the Nebraska statutory scheme of disparate permit fees in any way serves to protect the state's fish populations. At best the statutory scheme serves only to benefit resident fish dealers who are subject to minimal or no fee for the importation of fish. As the Court stated in *Toomer,* a state must exercise the power it has to "preserve and regulate the exploitation of an important resource," "so as not to discriminate without reason against citizens of other States." 334 U.S. at 402, 68 S.Ct. at 1165. This Nebraska has not done.

For the sake of completeness, I note that the defendant here spent considerable time arguing that Neb.Rev.Stat. § 37–702 and § 37–705 are also unconstitutional as a burden on interstate commerce in that only Nebraska residents may operate fish hatcheries and hold "fish culturist" permits in this state. My recommendation is in no way directed at that claim because I find that this defendant has no standing to challenge that portion of the statutes at issue. The defendant has not alleged that he ever applied for and was denied such a permit, or has been charged with any act relating to the propagation of fish in Nebraska. Thus the defendant has failed to show that he has "suffered any actual or threatened injury" as a result of this portion of the statutes. *Valley Forge Christian College, supra.*

---

**3.** As the defendant attempted to argue, the current $400.00 nonresident fish dealer permit fee, with no corresponding rise in the resident "fish culturist permit" fee, exacerbates the effect on interstate commerce. While this may be true, this case must be analyzed on the basis of the nonresident fee in 1986 since this defendant was not affected by the 1990 raise in nonresident fees. *See, Valley Forge Christian College v. Americans United for the Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (party challenging statute must show that he or she has suffered an actual or threatened injury). Certainly a conclusion that the $100.00 versus $20.00 fee disparity is unconstitutional makes the current disparity invalid as well. I do not, however, intend to imply that the constitutionality of this regulatory scheme, for purpose of either clause, is dependent upon the substantial percentage differential created by the new 1990 rates for nonresident permits. For purposes of the constitutional tests at issue in this case, it is the discrimination and fee disparity alone that offends the constitutional provisions at issue, not the percentage of the disparity.

As an aside, I note that the 1990 increase in the fee charged for the nonresident "fish dealer's permit" was enacted into law, according to the testimony of Wesley Sheets, at the request of resident "bait dealers" who requested the increase because they were being charged increased nonresident fees in some sister states. Such "retaliatory" fees are highly suspect under the Commerce Clause, and are likely unconstitutional. *See, New Energy Company of Indiana v. Limbach,* 486 U.S. 269, 278, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302 (1988), *citing, A & P Tea Co. v. Cottrell,* 424 U.S. 366, 379–80, 96 S.Ct. 923, 931–32, 47 L.Ed.2d 55 (1976).

Evidence at the evidentiary hearing indicated that the number of nonresident "fish dealer permits" decreased dramatically following the increase in fees in 1990. The number of permits issued over a six year period were as follows: 1985–7 permits, 1986–6 permits, 1987–6 permits, 1988–13 permits, 1989–15 permits, and 1990 (the year the $400.00 rate was imposed)–7 permits.

I therefore shall recommend that the information against the defendant be dismissed, because the underlying statutory scheme relating to the importation of live fish, which includes § 37–505, the necessary predicate statute to this Lacey Act prosecution, violates both the Commerce Clause and the Privileges and Immunities Clause of the Constitution.

## CLAIM IV

■ Finally the defendant alleges in his fourth claim that the application of 16 U.S.C. § 3372(a)(2)(A) and § 3373(d)(2) violates the Fifth and Eighth Amendments to the Constitution. This same argument was raised in the earlier action brought against the defendant, CR 90–0–36, and was adequately disposed of by Magistrate Judge Kopf in his order and recommendation, a copy of which is included in this case at filing # 18. In that order Judge Kopf found that the "catch-all" federal statute of limitations, 18 U.S.C. § 3282, was applicable in actions under the Lacey Act, *United States v. Thomas*, 887 F.2d 1341 (9th Cir.1989), and rejected the defendant's argument that the application of a longer period of limitation than that provided by state law was a violation of the due process clause of the Fifth Amendment. As the court noted in *Thomas*, charges under the Lacey Act are "brought by federal authorities in federal court pursuant to federal law," and the legislative history of the Act, as cited in *Thomas*, made it clear that Congress was aware that "violations of the Act will involve violations of state hunting laws and regulations that have historically been classified as misdemeanors ... [; n]evertheless ... the violation may be a felony violation in this Act." 887 F.2d at 1349. The Lacey Act is directed at controlling the "transportation or acquisition in interstate commerce of wildlife in violation of state, tribal, and federal wildlife law," *Id.* at 1343, and the defendant has cited no authority to support his argument that the due process clause of the Fifth Amendment forbids the federal government, in its efforts to regulate interstate commerce, from providing for a more severe penalty than would be exacted if the charges were filed in state court only under state law. This argument is without merit.

■ The defendant also argues that any punishment under these Lacey Act provisions is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment because such prosecutions involve penalties in excess of that provided by the underlying state law at issue. The government's response that "the Eighth Amendment does not apply until after an adjudication of guilt," *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir.1985), is well taken. This defendant has not been convicted of any crime and thus has not been sentenced or punished in any way.

## CLAIMS V & VI

In filing # 20 the defendant also raises two arguments for dismissal which are not based on allegations of a defective indictment. The defendant alleges that the information should be dismissed for prosecutorial misconduct and also argues that he is a victim of selective prosecution in violation of the Equal Protection Clause.

Upon consideration of the defendant's arguments and evidence relating to prosecutorial misconduct, I conclude that the defendant has wholly failed to proffer any evidence that the plaintiff in this case has engaged in any misconduct in prosecuting this case. This claim is without merit.

As to defendant's second claim, that he is the victim of selective prosecution,

> The burden in a selective prosecution claim falls heavily on the defendant. *United States v. Eklund*, 733 F.2d 1287, 1290 (8th Cir.1984), *cert. denied*, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); *United States v. Holmes*, 794 F.2d 345 (8th Cir.1986). To establish a prima facie case a defendant must show that the government singled him out for prosecution while others similarly situated were not prosecuted for similar conduct and that the government's action in thus singling him out was based on an impermissible motive such as race, religion, or the exercise by defendant of

constitutional rights. *See United States v. Catlett*, 584 F.2d 864 (8th Cir.1978); *United States v. Berrios*, 501 F.2d 1207 (2d Cir.1974); *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). If such showing is made, the burden shifts to the government to disprove defendant's case at an evidentiary hearing. Before a hearing is mandated, however, a defendant's claim must be supported by specific factual allegations that take the motion past a frivolous phase and raise a reasonable doubt as to the prosecutor's purpose.

*United States v. Wilson*, 806 F.2d 171, 176 (8th Cir.1986).

I have considered all of the evidence adduced at the evidentiary hearing held in this matter, and I conclude that the defendant has failed to provide any evidence that he was singled out for prosecution for any impermissible reason. This claim is also without merit. I shall therefore recommend that this motion be denied.

IT THEREFORE HEREBY IS RECOMMENDED that defendant's motion to dismiss, filing # 14, is granted in part and denied in part as set forth above, and that the information filed against the defendant be dismissed.

IT IS FURTHER RECOMMENDED that the defendant's motion to dismiss for prosecutorial misconduct and selective prosecution, filing # 20, be denied.

IT IS ORDERED:

The parties are hereby given three working days to file objections to this recommendation, and thereafter given three working days in which to file any response.

If no objection is filed, the parties may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

The clerk shall immediately notify counsel of entry of this document.

Dated April 30, 1991.

## MEMORANDUM, ORDER, AND RECOMMENDATION

Pending before the court are motions for reconsideration filed by both the intervenor State of Nebraska and the defendant Harold Hagen. These parties seek reconsideration of my earlier report, recommendation, and order, filing # 26, wherein I recommended that defendant's motion to dismiss, filing # 14, be granted in part and denied in part, and that the defendant's motion to dismiss for prosecutorial misconduct and selective prosecution, filing # 20, be denied.

The intervenor's motion to reconsider is limited to a request, not argued previously, that the court sever the unconstitutional portion of the fish importation statute; specifically, that I find only the nonresident fee schedule of the statutory scheme unconstitutional and leave in place the remainder which by reference incorporates Nebraska Game and Parks Commission regulations relating to the importation of fish.

Neither the intervenor nor the defendant Hagen have offered any cited authority on the question of severability. The court's research finds that it is state law which controls the question of severability of a state statute. *Ripplinger v. Collins*, 868 F.2d 1043, 1056 n. 16 (9th Cir.1989), *citing, Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506, 105 S.Ct. 2794, 2803, 86 L.Ed.2d 394 (1985).

The Nebraska Supreme Court has addressed this issue in several cases and of particular relevance here, in *Ewing v. Scotts Bluff Cty. Bd. of Equal.*, 227 Neb. 798, 420 N.W.2d 685 (1988). In that case the court addressed the issue as follows:

This court has often held:

"Where it appears that unconstitutional portions of an act can be separated from the valid portions and the latter enforced independent of the former, and it further appears that the invalid portions did not constitute such an inducement to the passage of the valid parts that they would not have been passed without them, the former may be rejected and the latter upheld."

*Tom & Jerry, Inc. v. Nebraska Liquor Control Commission*, 183 Neb. 410, 417–18, 160 N.W.2d 232, 238 (1968).

In *State ex rel. Douglas v. Sporhase,* 213 Neb. 484, 486, 329 N.W.2d 855, 856–57 (1983), we set out the test to be applied in determining whether an unconstitutional clause may be severed from the remainder of a statute, as follows:

(1) Whether, when absent the invalid portions, a workable plan remains. *Nelsen v. Tilley,* 137 Neb. 327, 289 N.W. 388 (1939). (2) Whether the valid portions of an act can be enforced independently, and where the invalid do not constitute such an inducement to the valid parts that the valid parts would not have been passed without the invalid parts. *State v. Padley,* 195 Neb. 358, 237 N.W.2d 883 (1976). (3) Whether the severance will do violence to the intent of the Legislature. *Chase v. County of Douglas,* 195 Neb. 838, 241 N.W.2d 334 (1976). (4) Whether a declaration of separability is included in the act, indicating that the Legislature would have enacted the bill absent the invalid portion. *State ex rel Meyer v. County of Lancaster,* 173 Neb. 195, 113 N.W.2d 63 (1962); *Nelsen v. Tilley, supra.*

227 Neb. at 806, 420 N.W.2d 685.

In the present case, the entirety of the statute at issue appears to be made up of all of Chapter 37. The revisor of statutes for the State of Nebraska has interpreted the words "This act," as referred to in the separate sections of Chapter 37, as including all of Chapter 37 of the Revised Statutes of the State of Nebraska. *See, e.g.,* Revisor's note to Neb.Rev.Stat. § 37–505 (Reissue 1988). As pertinent to the fourth prong of Nebraska's severability test, quoted above, the intervenor has cited no section of Chapter 37 which sets forth a "declaration of separability," and this court's review of that chapter indicates that no such statement of intent exists.

As noted in *Ewing,* however, the absence of such a declaration is not crucial to the conclusion of whether the constitutionally infirm portion of the statute is properly severable. In *Ewing* the court stated:

The bill in question did not contain a severability clause. The presence of a severability clause in the statute being examined is not essential to a ruling declaring the offending portion of a statute severable. In *Chase v. County of Douglas,* 195 Neb. 838, 852, 241 N.W.2d 334, 342 (1976), we stated: "Where such a [severability] clause is not present, we have held: '... a severability clause is merely an aid to construction and not an inexorable command. A severability clause in a statute is not a condition precedent to a determination of the question of severability.'" (Citations omitted).

227 Neb. 798, 806–07, 420 N.W.2d 685.

Applying the tests set forth by the Nebraska Supreme Court in *Tom & Jerry* and *Sporhase,* I must first determine whether a "workable plan" exists in the absence of the constitutionally infirm import fee schedule as set forth in §§ 37–505 and 37–703 through 37–705. The statutes at issue do not set forth specific import procedures or regulations. The intervenor now notes that § 37–505 acts as the enabling legislation by which the Nebraska Game and Parks Commission enacts regulations governing the importing of live fish into Nebraska, and has in this motion to reconsider requested that the court sever only the non-resident fee requirement from that statute and leave the remainder of the statute in place to allow Game and Parks the authority to continue to regulate the importation of live fish.

I first note that the Game and Parks Commission's regulations to which the intervenor refers, by attachment to its brief,[1]

---

1. I also point out that I cannot consider this as "evidence" in this case given that it was not properly offered and admitted into evidence at the evidentiary hearing held in this matter.

Intervenor also refers to the Game and Parks Commission's "Fish Health Policy," exhibit 200 offered by the intervenor and received into evidence at the evidentiary hearing, as evidence of

the regulations governing the importation of fish into Nebraska. Again I note that this "policy" of the Commission was adopted as of March 16, 1989, and, therefore is inapplicable to the alleged acts of the defendant. Secondly, even accepting the intervenor's argument that agency regulations have the force and effect of state law *if properly adopted and filed with the Secre-*

are not the regulations which were in force at the time the defendant is alleged to have violated § 37–505. The defendant's objection to this evidence is well taken, and I shall not consider the attached documents in disposing of these motions.[2]

The "workable plan" inquiry must include an analysis of whether the remaining portion of the statute applies equally to residents and nonresidents. The statutory scheme imposing permit requirements is far from a model of clarity. Section 37–505, upon which the Game and Parks Commission relies for its authority to regulate importation by residents and nonresidents, only implicitly requires that residents comply with any regulations promulgated by the Commission. The nonresident portion of § 37–505 states, in relevant part, that "[n]onresidents holding a valid nonresident fish dealer's permit may ... transport ... live fish ..., *in accordance with the regulations of the Game and Parks Commission.*" On the other hand, that portion of the statute which relates to residents merely states, "[g]ame fish lawfully shipped in from without the state, by residents of the state ... may be sold in the state."

At the evidentiary hearing, the defendant offered Game and Parks regulations Title 163, Ch. 2, which, according to the testimony of Wesley Sheets, Chief of Fisheries, were the regulations in place at the time the defendant is alleged to have violated Nebraska law, during the year 1986. Those regulations state that they were "prescribed by the Game and Parks Commission, State of Nebraska, under authority of state law 37–505...." The regulations require that nonresidents purchase a nonresident "Fish Dealer's Permit" in or-

der to "possess, buy sell, transport, or ship live fish ... legally obtained from without the State...."

The regulations go on, however, to set forth specific restrictions as follows:

*002.01* It shall be unlawful for any person, except employees of the Game and Parks Commission to stock any species of fish in any public waters of this State, whether obtained within or without the State, without written approval of the Commission, or to stock any nongame fish in any private waters of this State which overflows into or connects in any way to public waters.

*002.02* It shall be unlawful to transport into this State, or to sell, offer, or use any carp, carpsucker, buffalo, gar goldfish, quillback, or bowfin for use as bait.

*002.03* No person, either resident or nonresident, shall import or transport in any manner live fish, live bait minnows, crayfish or frogs into this State for any purpose without first complying with the following requirement:

*002.03A* All fish and fish eggs of the Salmonid Family (Trout, Char, and Salmon) imported into the State shall be free of Infectious Pancreatic Necrosis, Viral Hemorrhagic Septicemia, and *Myxosoma cerebralis;* and all catfish imported into the State shall be free from Channel Catfish Virus, and notification of such importation shall be supplied to the Game and Parks Commission in writing, not less than 15 days nor more than 30 days prior to such importation.

*002.04* Each Nonresident Fish Dealer will be required to report to the Game and Parks Commission twice each year

---

*tary of State, Nucor Steel v. Leuenberger,* 233 Neb. 863, 448 N.W.2d 909 (1989), there is no evidence or indication that exhibit 200 is a such a "regulation."

**2.** The intervenor state has also attached additional regulations to its most recent brief submitted on the order of this court, relating to the defendant's original motion to dismiss due to the insufficiency of the information. The defendant has registered his objection to these attached regulations, and particularly notes that the regulations submitted as Title 163, Chapter 2, which the state now alleges were the regula-

tions in effect during 1986, are not identical to those same regulations which were admitted into evidence at the evidentiary hearing as Exhibit 123. Neither the intervenor state nor the United States objected to the introduction of Exhibit 123 on the basis that those regulations were not in effect during the year 1986. In any event, Local Rule 20 makes clear that "[e]videntiary material attached to a brief but not filed shall not be considered," and I reiterate that the attachments to the intervenor's brief shall not be considered in the disposition of this matter.

on January 1 and July 1, listing all fish, live bait minnows, crayfish and frogs transported into Nebraska. The report shall show the date, number, species, size and name of purchaser. Reporting forms will be furnished by the Game and Parks Commission. Failure to comply with this regulation will disqualify the permittee for issuance of a subsequent permit.

Fisheries Chief, Wesley Sheets, testified that the regulations governing fish importation were essentially identical for residents and nonresidents, and indeed subparagraph 002.03 above mandates that *any* person, resident or nonresident must comply with the stated requirement.

In this case, to add fuel to the fire of confusion, the act containing § 37–505, which as noted above includes *all* of Chapter 37, also contains §§ 37–703 through 37–705. As noted in my prior report and recommendation, the intervenor State of Nebraska initially argued that § 37–705 controls the importation of fish into Nebraska by residents of the state. Section 37–705 states, in relevant part:

Upon payment of the permit fees as required by this act, ... game fish or minnows, lawfully held in possession in any other state or country, may be imported into this state by any legal holder of a breeder's permit described in sections 37–703 and 37–704....[3]

Again, there is no explicit reference within § 37–705 which would seem to require that residents holding fish breeder's permit (also known as fish culturist permit) need also to comply with any further regulations or requirements promulgated by the Game and Parks Commission. Yet, as noted above, the regulations enacted pursuant to § 37–505 specifically require that "any person, resident or nonresident" must comply with the specified Commission regulations.

Despite the fact that none of the parties to this action has addressed the relationship between §§ 37–705 and 37–505, I am not inclined to ignore the existence of § 37–705. On the other hand, it is difficult to ascertain its significance in Nebraska's importation scheme. The Nebraska Supreme Court has held:

When considering a series or collections of statutes pertaining to a certain subject matter which are *in pari materia*, they may be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions of the act are consistent and sensible. This court will, if possible, try to avoid a construction of a statute which leads to absurd, unjust, or unconscionable results.

*Coleman v. Chadron State College,* 237 Neb. 491, 500, 466 N.W.2d 526 (1991). A close examination of § 37–705 and § 37–505 reveals that the purpose of those sections of Chapter 37 is not identical, nor are the sections incompatible.

Article 7 of Chapter 37, entitled "Game and Fur Farming and Fish Culture," provides, in relevant part, for the licensing of Nebraska residents as fish culturists. Fish culturists, upon licensing, may "establish and maintain upon private lands, ponds for the culture and propagation of game fish and minnows, *subject to the restrictions imposed by this act.*" Neb.Rev.Stat. § 37–702 (Reissue 1988). Section 37–705 then provides that "upon payment of the permit fees ... any legal holder of a breeder's permit" may import into Nebraska game fish or minnows which are "lawfully held in possession in any other state or country."

In contrast, Article 5 of Chapter 37, entitled "Offenses Relating to Game and Fish," sets forth prohibited acts relating to the hunting, trapping, possession, and transport of game and fish. Section 37–505 specifically provides, in relevant part, that it "shall be unlawful to buy, sell, or barter ... any game fish protected by this act at any time, whether killed or taken within or without this state," and then enumerates specific exceptions to that prohibition. More specifically, the resident and nonresident provisions within § 37–505, which have been referred to ad nauseam

---

3. Again I note that § 37–704 allows only residents to obtain such a permit.

thus far, are directed at the importation of fish for purposes of *sale* in Nebraska.

Thus, in comparing § 37–505 and § 37–705 it appears that the former is intended to regulate the sale of imported fish while the latter merely allows fish culturists to import fish for purposes of propagation and culture. This interpretation of § 37–705 is further evidenced by the fact that the sale of the fish raised or propagated under a fish culturist's permit is specifically regulated by Article 7 pursuant to § 37–706 and Game and Parks regulations promulgated thereunder.

As noted above, however, a commercial fish culturist is still subject to all other "restrictions imposed by [Chapter 37]." *See,* § 37–702 and Revisor of statute's note thereunder. Therefore, even though a resident fish culturist may, as a right of being a legal holder of such a permit, be entitled to import game fish or minnows, he or she is presumably still subject to the restrictions found within § 37–505, which would include importation regulations promulgated by the Game and Parks Commission.

The intervenor State of Nebraska appears to argue in its brief that the "lawfully shipped in from without the state" language found in § 37–505 at least implicitly authorizes the Game and Parks Commission to promulgate regulations restricting the importation of fish by both residents and nonresidents. Certainly an explicit reference to such a requirement, as set forth in the sentence relating to nonresidents, would go a long way in assisting a court in its efforts to preserve legislative intent. Nonetheless, I cannot conclude that the intervenor's reading of the statute is unreasonable or illogical. While the words "lawfully shipped in" are not explicitly defined as the equivalent to meeting all the requirements of the Game and Parks Commission, such an inference is certainly a plausible explanation for the addition of those words in the statute. It is likely that those words were intended for a purpose other than merely filler, and the most reasonable explanation for the presence of the words is that there are restrictions on the manner and method in which fish may be imported. I therefore conclude that the definition of that phrase urged by the intervenor is reasonable, and appears consistent with the legislative intent of regulating the sale of fish which are shipped into the state by either residents or nonresidents.

Having established that the remainder of Nebraska's fish import regulatory scheme does not distinguish between an importer's state of residence, I conclude that the statutory scheme without the discriminatory permit fee was a "workable plan" as it existed in 1986.

The second and third inquiry are similar in that they provide for examination of the intent of the legislature in passing the various provisions at issue. As noted by the *Ewing* court, quoted above, the first part of the test in the second step of the severability inquiry is to determine whether the valid portions of the statute "can be enforced independently." For the reasons set forth below, I have no difficulty in concluding that the valid portions of § 37–505 can be enforced without the discriminatory permit fee requirement.

Section 37–103 provides that "[a]ny person violating any of the provisions of Chapter 37 ... or any of the rules and regulations, established by the Game and Parks Commission pursuant thereto, where a penalty is not otherwise fixed, shall be guilty of Class II misdemeanor." For purposes of Article 5, wherein § 37–505 may be found, the legislature has provided that violations of §§ 37–501 to 37–518 shall be a Class III misdemeanor. It is clear, then, that any violation of *either* the statute *or* the regulations carries criminal penalties, and the regulations regarding importation, quoted above, provide mandatory requirements other than the required possession of a nonresident fish dealer's permit. Those regulations are separate from the permit requirement and could be prosecuted in the absence of such a requirement.

The second part of the severability inquiry "determine[s] if the invalid portions of an act constituted such an inducement to the valid parts that the valid parts would not have been passed without the invalid parts." *Ewing,* 227 Neb. at 807, 420

N.W.2d 685. As noted by the intervenor, the principal concern of the state in maintaining § 37–505 as enabling legislation for Game and Parks regulations is to protect certain fish populations from the threat of outside diseases being brought into the state in imported stocks of fish. There is no indication from the face of the statute, nor would logic or reason dictate, that the legislature would not have passed a statute regulating the importation and sale of fish in the absence of the ability to charge nonresidents a permit fee which was higher than that charged residents.

I want to make clear that it is not the presence of a fee for importation permits which offends the United States Constitution in this case; it is merely that the fee charged nonresidents is, for no legitimate reason, higher than that charged residents. In short, I can find no reason to conclude that the legislature would have refused to pass *any* fish importation and sale restrictions simply because they could not charge disparate permit fees based on an importer's state of residence. The intent of this statute does not appear to be merely to raise revenue through permit fees, but rather was a genuine attempt to allow the Game and Parks Commission the authority to regulate the importation of fish which might adversely affect the native fish populations in this state.

Finally, as to the third step of the severability inquiry, for the same reasons set forth immediately above I cannot conclude that the severance of the higher nonresident permit fee "will do violence to the intent of the Legislature," *Ewing*, 227 Neb. at 808, 420 N.W.2d 685.

I conclude, therefore, that the nonresident permit fee portion of § 37–505 may be severed from that statute. Specifically, the last sentence of § 37–505, which states that "[t]he fee for a nonresident fish dealer's permit shall be one hundred dollars" must be deleted from that section in that it constitutes an unconstitutional burden on in-

terstate commerce in violation of the Commerce Clause and violates the Privileges and Immunities Clause.

■ Having now more closely examined the defendant's original motions to dismiss I do find it necessary to alter my initial recommendation on those motions. In my earlier recommendation I found § 37–505 unconstitutional because of the disparate nonresident fish dealer's permit fee. Neither the United States nor the State of Nebraska discussed or argued that the permit fee was in fact only a portion of the regulations relating to fish importation, and that even if this court finds the permit fee to be unconstitutional, if that portion were severed the defendant could still be charged with violating other provisions of that statute; and specifically other Game and Parks importation regulations.

It is true that the Game and Parks regulations in force during 1986 required more than merely a nonresident fish dealer's permit. As set forth more fully above, Title 163 Chapter 2 of the regulations (1) prohibits any person from stocking any species of fish in public waters without written approval of the Commission; (2) prohibits any transporting of certain types of fish into the state for use as bait; (3) requires (a) that fish of the Salmonid family and catfish family "shall be free" of certain listed diseases, (b) that the Commission be given "notification of such importation of fish of the Salmonid or catfish family"; [4] and (4) requires nonresidents to report twice a year any fish which have been imported into the state.

The information filed against the defendant merely alleges four counts of Lacey Act violations based upon the possession, transportation and sale in interstate commerce of trout in violation of "the applicable laws and regulations of the State of Nebraska." In my initial report and recommendation I failed to look beyond the face of the statute which the defendant is

---

**4.** The defendant has argued that ¶ 002.03A fails to give notice to the person charged thereunder that he, or she is required to notify the Commission in the case of the importation of fish of the Salmonid family (including trout). I agree with the defendant that the paragraph is not at all clear as it is written. However, given my ultimate disposition of his motion to dismiss I conclude that I need not specifically address this issue.

alleged to have violated, § 37–505, and did not consider that he is also charged with violating Game and Parks regulations as quoted above. Even if he cannot now be charged with failing to obtain a nonresident fish dealers permit, he is still subject to prosecution for conduct in violation of these regulations. The information, however, does not specify which of those regulations he is alleged to have violated.

Judge Kopf discussed this issue in the previous case against the defendant, and I am inclined to agree with his analysis and conclusions regarding this question. The only explicit requirement for nonresidents found within the language of § 37–505 itself was the possession of a nonresident fish dealer's permit. However, the statute also states that nonresidents may "possess, buy, sell, transport, and ship ... live fish ... *in accordance with the regulations of the Game and Parks Commission.*" Thus, upon a finding that the nonresident's fish dealer's permit *fee* is unconstitutional, the only remaining statutory requirements or rules with which the defendant could be charged must be found in the regulations promulgated by the Commission.[5]

The charging information in this case states that the defendant "possessed, transported and sold [rainbow trout] in violation of the *applicable laws and regulations of the State of Nebraska....*" That information does not, however, specify which regulation the defendant is alleged to have violated. As noted above, the fish importation regulations which the government has asserted were applicable during the year 1986, Title 163, Chapter 2, (Exhibit 123), are not specified in the charging information. Additionally, even assuming that these are the "regulations" referred to in the information, it is apparent from the language of the regulations that the provisions provide for the criminalization of more than one type of conduct.

The regulations promulgated pursuant to § 37–505 may be violated in more than one manner. As mentioned above, § 002.01 makes it unlawful to stock any species of fish in any public waters, or any private waters which overflow into public waters, without written approval of the Commission. Section 002.02 makes it unlawful to transport into this state, sell, offer, or use any "carp, carpsucker, buffalo, gar, goldfish, quillback, or bowfin for use as bait." Section 002.03 requires that any person importing fish must meet the following requirements: (1) that all fish and fish eggs of the Salmonid family, and channel catfish "shall be free" of certain diseases specified in the regulation, and (2) that notification of such importation "shall be supplied to the Game and Parks Commission in writing, not less than 15 days nor more than 30 days prior to such importation." Finally, § 002.04 requires that all nonresident fish dealers file a report to the Game and Parks Commission twice each year listing the fish transported into Nebraska and the purchaser.

As Judge Kopf noted in his previous report and recommendation on the prior

---

**5.** The government argues that even if this court severs the fee requirement from § 37–505 the defendant "is still fully charged with failure to obtain the requisite permit or authority to transport fish...." (Brief of Government, July 11, 1991 at p. 1). The government appears to be arguing that even if the nonresident fee requirement is severed from the Nebraska statute the defendant was still required to have obtained *some* permit to import fish into Nebraska.

This argument is of no avail to the United States. At the time of the alleged acts which form the basis of the information filed against the defendant, the *only* permit which was available to the defendant was the nonresident permit which cost $100.00. The government does not dispute that the defendant, a nonresident, would not have been able to obtain a "fish culture" permit, pursuant to § 37–705. The government argument that the "permit fee structure is incidental to the defendant's conduct" ignores the fact that the payment of that fee was the only means by which the defendant could have obtained such a permit.

The government is correct that this court has only invalidated the disparate fee provision of the Nebraska fish import statutes, and has not held that the State of Nebraska cannot require a permit for anyone wishing to import fish into the state. As that requirement now exists, and as it did at the time the defendant is alleged to have imported fish, the defendant could not have obtained such a permit without first having paid an unconstitutionally inflated fee because of his nonresident status.

action filed against the defendant, the general rule is stated as follows:

> If the statute charges a variety of possible offenses, a pleading in the statutory language that does not indicate which offenses defendants are alleged to have committed is insufficient, and if the statute is couched in general terms, the indictment [or information] must particularize the offense sufficiently to inform the defendant of the accusation he must meet.

Wright, *Federal Practice and Procedure: Criminal 2d,* § 125 at 370.

In my earlier report and recommendation I denied the defendant's motion to dismiss based on the sufficiency of the information. My conclusion was based on the incorrect premise that as a nonresident the defendant could only have been charged with that portion of § 37–505 relating to his alleged failure to obtain a nonresident fish permit. On closer examination I find that as a nonresident he must also comply with the "regulations of the Game and Parks Commission." Indeed, upon severance of the nonresident fish dealer's permit fee, the only violations of state law remaining are the Commission's importation regulations.

Upon reassessment, then, it appears that the defendant's position in his earlier mo-

tion is well taken, even if the basis of his argument did not rest on these Commission regulations. The information filed herein fails to properly inform the defendant of the charges against him, in that the state law alleged to have been violated criminalizes more than one type of conduct. Indeed, not only does the government fail on the face of the information to specify which regulations form the basis of the charge, it also fails to adequately specify any essential facts which might be sufficient to constitute a violation of one of the regulatory provisions.[6]

As I noted in my previous report, Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that a proper indictment consist of "a plain, concise and definite written statement of the essential facts constituting the offense charged." The standard for judging the sufficiency of an indictment is whether it

> first, contains the elements of the offense charged and fairly informs a defendant of the charge against him which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

*Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590

---

**6.** Indeed the uncertainty surrounding precisely what the government intends to charge as the underlying state law violation is evident from the briefs submitted in this matter since these proceedings were transferred to me by Judge Kopf. In its initial brief the government states that the defendant "Hagen violated Neb.Rev. Stat. § 37–505 by failing to obtain a permit to sell Rainbow trout in Nebraska from Colorado." (Government's Response Brief to Defendant's Motion to Dismiss Information at 2). The government further stated, in its argument relating to the Commerce Clause issue:

> Had [Hagen] procured the proper permit, he could possess, buy, sell, transport and ship Rainbow trout from Colorado to Nebraska. There is virtually no limits [sic] to the type of activities that Hagen's business could conduct within the State of Nebraska; he must however procure a permit. Based upon the facts of the instant case, Hagen was not prohibited from engaging in business with the state of Nebraska; he was only required to obtain a permit.

("Government's Response Brief to Defendant's Motion to Dismiss Information" at 9).

On the other hand, in its most recent brief to this court the government argues that the "charged conduct in 1986 was defendants refusal to obtain permission for the interstate shipments and his flaunting of that refusal," and further states that "[t]he permit fee structure is incidental to the defendant's conduct...." (Government's Response to Defendant's Motion to Dismiss at 1–2). First, I note that the government does not cite any statutory authority, either state law or regulation, to support its version of the "charged conduct." Second, I have previously disposed of the government's contention that the defendant could, in the absence of the fee provision, still be charged with failure to obtain a permit to import fish. This footnote is intended to illustrate that in the absence of the ability to charge the defendant with failure to obtain a nonresident fish dealer's permit, I have had some difficulty in grasping what conduct the government intends to allege as the underlying state law violation for this Lacey Act prosecution.

(1974). *See also, United States v. Lame,* 716 F.2d 515, 518 (8th Cir.1983). In this case the information alleges knowing transportation and sale in interstate commerce of "fish, to wit: rainbow trout" which were possessed, transported and sold "in violation of the applicable laws and regulations of the State of Nebraska." The information then goes on to cite 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(2) and Neb. Rev.Stat. § 37–505. Given § 37–505's incorporation of the Commission's importation regulations, and the importance of those regulations to the Lacey Act violation alleged herein, I conclude that there is nothing on the face of the information which would fairly inform the defendant of the charges against him.

■ Finally, the defendant's motion to reconsider, filing # 33, requests that I specifically consider an argument raised in his closing statements at the evidentiary hearing which relates to certain enumerated "exceptions" to the Lacey Act, codified at 16 U.S.C. § 3377. Specifically, the defendant argues in defense that the exception found at § 3377(c) is applicable in his case, thus barring this prosecution.

I first note that such a defense is more appropriately addressed at trial. Nevertheless, I conclude that the defendant's interpretation of § 3377(c) is in error and does not provide a basis for the dismissal of this action.

> Section 3377(c) provides, in relevant part:
>
> The provisions of paragraph (2) of section 3372(a) of this title shall not apply to the interstate shipment or transshipment through ... a State of any fish or wildlife or plant legally taken if the shipment is en route to a State in which the fish or wildlife or plant may be legally possessed.

The defendant interprets that paragraph as requiring only that he show that the fish which were transported in interstate commerce were (1) "legally possessed in the state of origin" and (2) "may be legally possessed in the state of final destination." Even assuming that the defendant can prove both of the above elements, I cannot

agree that § 3377(c) is applicable in this case.

The plain language of the statute shows that it was intended to cover situations where certain fish, wildlife, or plants were shipped *through* a state which made such possession or shipment illegal. There is no indication that the exception was intended to apply in a case such as this where a defendant may have had legal possession of the fish at issue in the state of origin, for instance, and shipped those fish *to* a state which did not make possession of that item illegal. In this case it is not the legal possession of the fish which is at issue; the principal violation is based upon allegations that the defendant transported fish in interstate commerce in violation of the import laws of the state of destiny, Nebraska.

In *United States v. Miranda,* 835 F.2d 830 (11th Cir.1988), the circuit court rejected the defendants' attempt to rely on this exception to avoid a conviction under the Lacey Act for illegal possession and sale of undersized spiny lobster tails, more commonly known as "shorts," in the State of Florida. The Court held:

> Section 3377(c) clearly does not apply to the facts of this case.... The statutory exception speaks to cases where a shipment of wildlife or fish *only passes through a state;* it is irrelevant where wildlife or fish is knowingly possessed and sold in interstate commerce in violation of state law. In this case [the defendants] were implicated in illegal possession and sales in Florida, regardless of the source or destiny of the lobster tails. *Accord United States v. Martinell,* 611 F.Supp. 399 (M.D.Pa.1985).

835 F.2d at 832 (Emphasis added).

Similarly, the defendant herein is being charged with violating the import laws of the State of Nebraska, regardless of whether his possession or the buyers' possession was legal in the source state and destiny state. This is not a case where the defendant is being charged with a crime in a state through which the fish merely passed during transport. This exception is inapplicable in this case. The defendant's motion to reconsider is therefore denied.

In summary, I find on this motion to reconsider that I must alter my earlier recommendation. First, I have not discussed or modified my previous report and recommendation as to the defendant's motion to dismiss for prosecutorial misconduct or selective prosecution, filing # 20. Second, my prior recommendation regarding the defendant's vagueness challenge, filing # 14, ¶ II, and Fifth and Eighth Amendment challenges, filing # 14, ¶ IV, remains unchanged.

On the other hand, this motion to reconsider has persuaded me that the defendant's motion to dismiss at filing # 14 should be still be granted, but for reasons different from those previously set forth. My conclusion that Nebraska's nonresident fish dealer's permit fee is unconstitutional in its burden on interstate commerce and is also violative of the Privileges and Immunities Clause remains unchanged. However, based on the analysis set forth above I find that the offending portion of § 37–505 which establishes the $100.00 fee can properly be severed from the statutory scheme, thus leaving in place the authority of the Game and Parks Commission to enact regulations relating to the importation of fish for residents and nonresidents. For those reasons I must now conclude that the defendant's motion to dismiss based on the Nebraska statute's violation of the Commerce Clause and Privileges and Immunities Clause, filing # 14 ¶ III, must be denied, because he remains subject to the 1986 regulations promulgated pursuant to § 37–505.

My rejection of the defendant's motion to dismiss on the Commerce Clause and Privileges and Immunities Clause claims is, however, contingent upon my finding that the nonresident permit fee language is severable from § 37–505. If the trial judge adopts my conclusion that § 37–505 is unconstitutional, but rejects the view that the offending portion of the statute is severable therefrom, then my original recommendation of dismissal remains the same.

If the trial judge adopts my entire analysis and conclusion stated above, then, upon reconsideration, I conclude that the defen-

dant's motion to dismiss, filing # 14, based on the issue of the insufficiency of the information should be granted. I find that the information does not fairly inform the defendant of the charges he must meet, in that it does not specify which regulations his conduct is alleged to have violated.

IT IS THEREFORE HEREBY ORDERED (1) the intervenor's motion to reconsider, filing # 32, is granted as set forth in the above memorandum; (2) the defendant's motion to reconsider, filing # 33, is denied.

UPON RECONSIDERATION IT IS FURTHER RECOMMENDED to the Honorable William G. Cambridge, pursuant to 28 U.S.C. § 636(b)(1)(B), that the defendant's motion to dismiss, filing # 14, be granted as to the issue of the insufficiency of the information at ¶ 1, and denied in all other respects.

Dated July 17, 1991.